**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

Law Offices of Bruce J. Chasan, LLC
1500 JFK Boulevard, Suite 910
Philadelphia, PA 19102

Bruce J. Chasan, Esq.
1500 JFK Boulevard, Suite 910
Philadelphia, PA 19102

    Plaintiffs

    vs.

John M. Pierce, Esq.
c/o John Pierce Law
21550 Oxnard Street – 3d Floor
Woodland Hills, CA 91367

James D. Bainbridge, Esq.
c/o Bainbridge Law APC
1801 Century Park East, 24th Floor
Los Angeles, CA 90067

Pierce Bainbridge Beck Price &
 Hecht, LLP
c/o John Pierce Law
21550 Oxnard Street – 3d Floor
Woodland Hills, CA 91367

Bainbridge Law APC
1801 Century Park East, 24th Floor
Los Angeles, CA 91367

Pierce Bainbridge P.C.
c/o John Pierce Law
21550 Oxnard Street – 3d Floor
Woodland Hills, CA 91367

John Pierce Law, P.C.
21550 Oxnard Street – 3d Floor
Woodland Hills, CA 91367

Civ. Action No. 2023-cv-_____

**<u>JURY TRIAL DEMANDED</u>**


**<u>COMPLAINT</u>**

John Doe Attorneys Nos. 1-10

John Doe Entities Nos. 1-10

                    Defendants

**COMPLAINT**

**NATURE OF ACTION**

1.      This action is brought in federal court based on diversity of citizenship and an amount in controversy greater than $75,000.    Plaintiffs seek equitable relief in the form of a decree vacating the judgments in (a) *Law Offices of Bruce J. Chasan, LLC, et al. v. Pierce Bainbridge Beck Price & Hecht, LLP, et al.*, No. 18-cv-5399-AB, 2019 WL 1957950 (E.D. Pa. May 2, 2019), and (b) *Law Offices of Bruce J. Chasan, LLC, et al. v. Pierce Bainbridge Beck Price & Hecht, LLP*, *et al.*, No. 20-cv-1338-AB, 2021 WL 148406 (E.D. Pa. January 15, 2021).   This action is based on after-discovered fraud perpetrated by Defendants John M. Pierce, Esq., James D. Bainbridge, Esq., and Pierce Bainbridge Beck Price & Hecht, LLP, and very likely other attorneys formerly employed by Pierce Bainbridge Beck Price & Hecht, LLP, denominated John Does 1-10 at this time.

2.      As noted in Fed. R. Civ. P. 60(d)(1), the Court has power to entertain an action to relieve a party from a judgment, order, or proceeding. After-discovered fraud is grounds to entertain an action in equity to set aside a judgment.  *Averbach v. Rival Manufacturing Co.*, 809 F.2d 1016, 1019-

1023 (3d Cir. 1987).  *See also*, 42 Pa. C. S. A. § 5504(b); *First Union Mortgage Co. v. Frempong*, 744 A.2d 327, 334-335 (Pa. Super. 1999).

3.     The fraud of the Defendants in this matter was discovered by Plaintiffs on February 24-25, 2021 when Plaintiffs' former client Lenwood Hamilton unexpectedly contacted Plaintiff Bruce J. Chasan, Esq. ("Chasan') in unsolicited telephone calls and disclosed information that Defendants had lied in their dealings that gave rise to the two lawsuits identified in paragraph 1 above.  The falsehoods will be discussed in greater detail in subsequent paragraphs in this Complaint.  The information was not discoverable by Plaintiffs before the fortuitous telephone calls from Mr. Hamilton on February 24-25, 2021, despite diligent efforts by Plaintiffs to obtain discovery from Mr. Hamilton in the two lawsuits.

4.     The Pennsylvania statute of limitations for filing a lawsuit based on fraud is two years, 42 Pa. C. S. A. § 5524(7).  The limitations period is tolled in the event of fraud which could not have been discovered despite due diligence.  *E.g., Fine v. Checchio,* 870 A.2d 850, 857-861 (Pa. 2005)*; Smith v. Blachley*, 41 A. 619, 188 Pa. 550, 553-556 (Pa. 1898); *Cloyd v. Reynolds*, 52 Pa. Super. 365, 369-372 (Pa. Super. 1913).  *See also*, *Adams v. Zimmer US, Inc.*, 943 F.3d 159, 163-167 (3d Cir. 2019); *Bohus v. Beloff*, 950 F.2d 919, 925-926 (3d Cir. 1991).

5.     In addition to equitable relief vacating the judgments in the two lawsuits described above in paragraph 1, this lawsuit includes counts seeking

(i) damages for breach of a settlement agreement, (ii) damages and punitive damages for tortious interference with contractual relations, (iii) damages and punitive damages for civil conspiracy, (iv) damages and punitive damages for tortious acts in concert with another and/or aiding and abetting fraud, in violation of the Restatement (Second) of Torts, § 876, and (v) damages and punitive damages for falsely reporting to Chasan that his former client Lenwood Hamilton had authorized an 8-figure legal malpractice case against Chasan, thereby prejudicing Chasan's insurability in the attorney errors and omissions market.

## PARTIES

6.     Law Offices of Bruce J. Chasan, LLC ("BJC Law") is a Pennsylvania limited liability company organized in 2012.  BJC Law has offices at 1500 JFK Boulevard, Suite 910 (formerly Suite 312), Philadelphia, PA 19102.

7.     Bruce J. Chasan, Esq. ("Chasan") is an attorney at law licensed in Pennsylvania since 1979, and a resident of Pennsylvania.  Chasan was first admitted to the bar in Massachusetts in 1972.  Chasan is the sole member of BJC Law and has offices at 1500 JFK Boulevard, Suite 910 (formerly Suite 312), Philadelphia, PA 19102.

8.     John M. Pierce, Esq. ("Pierce") is a California resident and licensed attorney in California.  Pierce currently has his law office known as

"John Pierce Law" at 21550 Oxnard Street – 3d Floor, Woodland Hills, CA 91367.

9.      James D. Bainbridge, Esq. ("Bainbridge") is a California resident and licensed attorney in California.  Bainbridge currently has his law office known as "Bainbridge Law APC" at 1801 Century Park East, 24th Floor, Los Angeles, CA 90067.  Bainbridge frequently uses the name "Jim."

10.      Pierce Bainbridge Beck Price & Hecht, LLP ("PBBPH Law") is a California limited liability partnership, formed in 2018.  In 2018, PBBPH Law had its main offices at 355 S. Grand Avenue, 44th Floor, Los Angeles, CA 90071.  In the time period 2018-2020, PBBPH Law also had offices in Ohio, Massachusetts, New York City, and Washington, D.C. (but not in Pennsylvania).  Pierce and Bainbridge were partners in PBBPH Law.

11.      John M. Pierce, Esq. ("Pierce") is or was the global managing partner of PBBPH Law in the time period 2018-2021, with offices at 355 S. Grand Avenue, 44th Floor, Los Angeles, CA 90071.

12.      During the first six months of 2020, PBBPH Law experienced hard times in that it had not achieved projected litigation successes, it had financial difficulties, partners had left the firm, and Managing Partner Pierce had well-publicized substance abuse problems.

13.      Bainbridge Law APC is a law firm organized by Bainbridge on March 20, 2020.  It currently has offices at 1801 Century Park East, 24th Floor, Los Angeles, CA 90067.

14.     Pierce Bainbridge P.C. is a law firm organized by John M. Pierce (and perhaps unknown others) on May 20, 2020.  At the time it was organized, it had offices at 355 S. Grand Avenue, 44th Floor, Los Angeles, CA 90071.  To the best of Plaintiffs' knowledge, information and belief, Pierce Bainbridge P.C. currently has offices at 21550 Oxnard Street – 3d Floor, Woodland Hills, CA 91367.

15.     John Pierce Law P.C. is professional corporation organized by Pierce on January 12, 2022.  It has its offices at 21550 Oxnard Street – 3d Floor, Woodland Hills, CA 91367.

16.     Upon information and belief, Bainbridge Law APC, Pierce Bainbridge, P.C., and John Pierce Law, P.C. are all successors in interest to PBBPH Law.

17.     John Doe Attorneys Nos. 1-10 are attorneys who were formerly partners or associates at PBBPH Law, of either gender, who also may have been involved in the fraudulent and deceptive activities of Pierce and Bainbridge, as further described in this Complaint. John Doe Attorney Nos. 1-10 are non-residents of Pennsylvania.

18.     John Doe Entities Nos. 1-10 are other law firms and/or litigation funding organizations that may have succeeded to the handling of the caseload of PBBPH Law, or otherwise hold the assets and/or liabilities of PBBPH Law.  John Doe Entities Nos. 1-10 are non-residents of Pennsylvania.

19.     Upon information and belief, PBBPH Law failed to pay full rent for

the premises it occupied at 355 S. Grand Avenue, 44th Floor, Los Angeles CA 90071 beginning April 1, 2020 (according to a complaint filed in the Superior Court of Los Angeles County, CA, No. 21STCV13140).

20.   Upon information and belief, Pierce Bainbridge P.C. was an unauthorized subtenant or assignee of PBBPH Law at 355 S. Grand Avenue, 44th Floor, Los Angeles CA 90071 as late as March 31, 2021 (according to a complaint filed in the Superior Court of Los Angeles County, CA, No. 21STCV13140).

21.   Upon information and belief, PBBPH Law is currently defunct.

## BACKGROUND

### I.  THE CONTRACT AND INTERFERING TERMINATION

22.   Lenwood "Skip" Hamilton ("Hamilton") contracted with BJC Law on December 31, 2016 by signing an "Engagement Letter" drafted by Chasan on December 30, 2016, whereby Hamilton retained BJC Law to represent him in a "right of publicity" case in which Hamilton would allege that the creators of the Gears of War ("GOW") video game series used his voice and likeness without authority and without compensation.  A true copy of the Engagement Letter signed by Hamilton is attached as **Exh. A**.

23.   The Engagement Letter (**Exh. A**) contemplated a lawsuit against the creators of the GOW video games, namely Epic Games, Inc. and Microsoft, Inc. (*i.e.*, Microsoft Corporation), and certain Microsoft affiliates, and Lester Speight, whom the creators of the GOW video games had publicly

identified as the voiceover actor for the avatar Augustus Cole ("Cole Train") depicted in the GOW video games.

24.    In ¶ 2 of the Engagement Letter, BJC Law recited that Chasan's hourly rate for litigation matters was $450, but added: "HOWEVER, WE HAVE AGREED TO TAKE THIS MATTER ON A CONTINGENT FEE BASIS OF 40%, PROVIDED YOU [HAMILTON] ARE RESPONSIBLE FOR ALL COSTS AND EXPENSES."   The Engagement Letter did not require or obligate BJC Law or Chasan to provide any unreimbursed expenses, or to search for a litigation funder to fund Hamilton's case.

25.    Also, ¶ 4 of the Engagement Letter stated BJC Law would bill Hamilton on a monthly basis (albeit Hamilton was not required to pay the monthly bills due to the contingent nature of the representation).

26.    Paragraphs 10-11 of the Engagement Letter stated in part:

10.    Special Considerations.   As stated above, this case is being handled on a contingent fee basis, with the attorney's fee being 40 percent of the net recovery (if any) obtained by verdict or settlement.  If funds are obtained in settlement or via verdict, all expenses will be reimbursed off the top.  The net left over sum will be split 60-40.   Should you reject a reasonable settlement offer against our recommendation, we reserve the right to withdraw, while retaining a quantum meruit interest in whatever verdict or settlement is later obtained.

11.    Commencement and Termination.  This engagement may be terminated at any time by any party, subject to our obligations under the Rules of Professional Conduct.  If our engagement terminates, you remain obligated to pay us in full at our regular hourly rates and/or fixed fees for all of our past services and expenses, in accordance with the terms of this letter.

27.    Paragraph 11 of the Engagement Letter also requested Hamilton to advance a $1000 retainer for costs and expenses (in connection with the filing fee and service fees for the complaint that was being contemplated, and other expenses), and as a further condition of his agreement to the terms of the Engagement Letter, Hamilton remitted a cashier's check to BJC Law for $1000 on or about 1/8/2017.

28.    From time to time until March 2018, Hamilton remitted an additional $2100 to BJC Law to cover expenses for the services of a copy service and other vendors, that were utilized by BJC Law in the handling of Hamilton's case.  However, some of these funds were contributed by Hamilton's friends, Dr. Ray Abdallah, a Doctor of Chiropractic ("Abdallah"), and Kevin Conrad, Esq. ("Conrad"), as Hamilton often did not have the cash.

29.    As will be elaborated below, Hamilton lacked resources to fund retention of expert witnesses, pay for depositions, and/or otherwise fund the litigation through trial.

30.    BJC Law provided Hamilton with monthly invoices for several reasons, including but not limited to (a) accounting for expenses; (b) apprising Hamilton of the tasks, time and effort expended by Chasan on his behalf; and (c) supporting any potential claim for attorney's fees that might be made in the litigation pursuant to any fee-shifting statute, such as the Lanham Act.   Chasan used his customary billing rate of $450 per hour.

31.    On March 28, 2018, Carolynn Beck, Esq., a PBBPH Law attorney,

at the request of Pierce, emailed to Chasan a copy of a "Termination Letter"

signed by Hamilton, dated March 27, 2018 (**Exh. B** hereto).   The body of

this letter stated in full:

> Dear Mr. Chasan,
>
> This letter is to terminate my engagement with you, effective
> as soon as substitution of counsel Pierce Bainbridge Beck
> Price & Hecht can be finalized.  Thank you for your efforts to
> date in my matter.
>
> Please send a copy of my legal file as soon as possible to
> Pierce Bainbridge Beck Price & Hecht LLP 600 Wilshire Blvd.,
> Suite 500, Los Angeles, CA 90017 [former address of PBBPH
> Law in Los Angeles].  This should include all hard copy
> materials, including any thumb drives and documents you
> have retained in my case.  Please send all electronic
> materials to john@piercebainbridge.com,
> carolynn@piercebainbridge.com and
> grace@piercebainbridge.com.

32.    As of 3/28/2018, when Beck forwarded the "Termination Letter,"

neither Hamilton nor PBBPH Law nor Pierce nor Beck had paid BJC Law

anything for the value of Chasan's time (then over $300,000 according to

invoices and timesheets), or discussed quantum meruit, or discussed a

division of any proceeds that might be received via settlement or judgment.

33.    As will be elaborated in the following paragraphs, any value of

Hamilton's case as of 3/28/2018 was due solely to the advocacy of BJC Law

and Chasan on Hamilton's behalf.

34.    As will be elaborated below, PBBPH Law and Pierce and his

partners saw an opportunity to take over the handling of Hamilton's case

and seized it, without concern for fair compensation of BJC Law and Chasan.

## II.  BJC LAW'S HANDLING OF HAMILTON'S CASE BEFORE THE ARRIVAL OF PIERCE AND PBBPH LAW

35.    Hamilton first met with Chasan on 12/29/2016 at the offices of BJC Law to discuss Hamilton's case.  Chasan and Hamilton were strangers at the time.  Hamilton was referred to Chasan by Attorney Conrad.

36.    Hamilton presented Chasan with a thumb drive which included, *inter alia*, background information on his Soul City Wrestling organization (which had been active between 1996 and 2011), the involvement of Lester Speight with Soul City Wrestling in 1998, and a report by a forensic voice examiner, Tom Owen, dated 4/29/2016, concluding that the voice of "Cole Train" in the GOW video games was Hamilton's voice.

37.    The next day Chasan conferred further with Conrad, who had been advising and assisting Hamilton.  Chasan decided he would take the case and drafted an Engagement Letter.

38.    In the next few days Chasan conferred further with Conrad and Abdallah and determined that Hamilton had first discovered the use of his voice in the GOW video games on January 11, 2015.  Several tort claims that might serve as a basis for Hamilton's lawsuit had a two-year statute of limitations, which meant that Chasan would have to file Hamilton's Complaint no later than January 11, 2017 to avoid a time bar of certain tort claims.

39.    On 1/11/2017, Chasan filed Hamilton's Complaint in Federal Court in Philadelphia, relying on the Lanham Act and diversity of citizenship

for Federal Court jurisdiction.  The Complaint was captioned *Lenwood Hamilton v. Lester Speight, Epic Games, Inc., Microsoft, Inc., Microsoft Studios, and The Coalition, a division or subsidiary of Microsoft, Inc.*, No. 17-cv-0169-AB.   The Complaint was assigned to Hon. Anita B. Brody, U.S. District Judge.

40.    In preparing the Complaint, Chasan received information and materials from Hamilton, Attorney Conrad, and Abdallah.

41.    It was apparent that Conrad and Abdallah were mentoring and assisting Hamilton in every way possible.

42.    Hamilton, Conrad and Abdallah all mentioned to Chasan that Hamilton had solicited a number of attorneys in Philadelphia and elsewhere before approaching Chasan, and all had declined his case.  Law firms that had been solicited included, but were not limited to: Panitch Schwarze Belisario & Nadel, LLP; Duane Morris LLP; Caesar Rivise, P.C.; Buchanan Ingersoll & Rooney, P.C.; Zarwin Baum DeVito Kaplan Schaer Toddy, P.C.; Boies Schiller Flexner LLP; Gibson Dunn & Crutcher LLP; Sprague and Sprague; McCausland Keen + Buckman; Braverman Kaskey, P.C.; and Charles Campbell, Esq.  Some, but not all, of these law firms were disclosed to Chasan at the time of his first meeting with Hamilton.

43.    The Complaint filed by Chasan on 1/11/2017 alleged six Counts: (I) Unauthorized Use of Name or Likeness (Including Voice) in Violation of 42 Pa. C. S. A. § 8316; (II) Lanham Act, § 43(a)(1)(A); (III) Lanham Act, §

43(a)(1)(B); (IV) Unjust Enrichment; (V) Misappropriation of Publicity (*i.e.*, a common law right of publicity claim); and (VI) Invasion of Privacy (*i.e.* common law invasion of privacy count).  The Complaint alleged that Hamilton's voice was used in the GOW video game series and was supported by the 4/29/2016 expert report by forensic voice examiner Tom Owen, included as an exhibit to the Complaint.

44.   The Complaint alleged that the GOW video games had achieved over $1,000,000,000 in sales worldwide between 2006 and 2017.   This was based on publicly available information.

45.   Chasan promptly arranged service of process on the Defendants.

46.   Beginning 1/12/2017, Chasan began to contact third-party litigation funders to discuss funding the expenses of the case, as Hamilton lacked funds to do it himself.

47.   Also beginning 1/12/2017, Chasan began contacting damages experts to discuss how they would go about analyzing damages and what they expected the probable expense of their services was likely to be.

48.   On 1/16/2017, Chasan discussed with Hamilton and Abdallah by telephone how third-party litigation funding works, and how third-party funders invest in cases.  On that date, Hamilton signed a non-disclosure agreement with Rembrandt IP Management, LLC ("Rembrandt"), a potential third-party litigation funding organization.  Chasan, with promotional literature from Rembrandt, had explained to Hamilton how third-party

litigation funders typically finance cases, on a non-recourse basis, but seek a 300 percent return on their investment from the settlement or judgment. Hamilton was supportive of getting a third-party litigation funder on board.

49.    On 1/19/2017, Chasan prepared an estimated budget for anticipated litigation expenses (including expert witness fees, but nothing for attorney's fees) to submit to Rembrandt.  At the time, Chasan's preliminary, good-faith estimate was $358,000.

50.    On 1/23/2017, Chasan had a telephone conversation with Abdallah in which the subjects of attorney-client privilege and waiver were discussed.  Chasan informed Abdallah that communications to Hamilton through Abdallah had to be curbed because Abdallah was neither the client nor an attorney, and his involvement almost certainly risked waiver of the attorney-client privilege.  Chasan also mentioned this concern to Hamilton.

51.    Efforts to restrict communications through Abdallah were short-lived for numerous reasons including (1) Hamilton was a frequent visitor to Abdallah's chiropractic offices in Bridgeport, PA; (2) Hamilton did not have a computer or an email address, so numerous communications from Chasan to Hamilton, and *vice versa*, were sent back and forth via emails to and from Abdallah (who would print the emails and attachments and provide them to Hamilton), and also send information to Chasan; and (3) Hamilton wanted Abdallah involved and frequently sought Abdallah's layman's counsel, as Hamilton viewed Abdallah as a trusted friend and advisor.   Hamilton

conversed regularly with Abdallah (and others) about his case.

52.     On 1/24/2017, Chasan made an initial contact to Wes Anson and his colleagues at CONSOR, of La Jolla, California.  Anson and CONSOR are perhaps the most experienced U.S. experts with regard to damages in "right of publicity" cases.  Anson and colleagues had testified as expert witnesses numerous times in the prior 30 years and had written and published on the principles of valuation in "right of publicity" cases.

53.     Anson and CONSOR were interested in working on Hamilton's case, especially since the commercial success of the GOW video games hinted at a possible respectable large damages assessment.

54.     Anson and CONSOR estimated the cost of evaluating discovery, preparing expert reports, appearing at expert depositions, and appearing at trial, was likely to be between $175,000 and $250,000.  Of course, they could not predict damages with any precision before doing the work.

55.     Anson and his CONSOR colleagues forwarded to Chasan their curricula vitae, which Chasan in turn forwarded to Rembrandt.

56.     Chasan met with Hamilton and various witnesses at Abdallah's Bridgeport, PA offices on 1/24/2017.  (Chasan would later meet with Hamilton again at Abdallah's offices on at least the following dates: 2/11/2017; 2/13/2017; 2/18/2017; 3/4/2017; 3/18/2017; 1/13/2018; 1/27/2018; 3/3/2018; and 3/10/2018, always driving there in his own car).

57.     On 1/27/2017, Chasan sent information to Rembrandt

concerning Wes Anson and CONSOR, and stated he would submit a revised estimated budget.

58.    On 1/30/2017, Chasan was contacted by retained counsel for Microsoft and Lester Speight, namely Elizabeth McNamara, Esq. ("McNamara"), who requested an extension until March 8, 2017 to respond to Hamilton's Complaint.  Chasan agreed.   On 1/31/2017, Chasan was contacted by retained counsel for Epic Games, namely Robert Van Arnam, Esq. ("Van Arnam") who also requested an extension until March 8, 2017. Chasan agreed.

59.    On 1/31/2017, Chasan sent Rembrandt a revised estimated litigation budget of $570,000 to handle all expert witnesses and depositions and bring the case to trial.

60.    On 2/7/2017, a representative of Rembrandt advised Chasan that it was a "No" for Rembrandt, but he also provided contacts for four other third-party funders that might be interested.  Chasan began to reach out to other third-party funding organizations.

61.    On 2/14/2017, Chasan filed an Amended Complaint (ECF 16)[1] which was based on additional information he had obtained from Hamilton, and additional research into the GOW video games, and additional legal research.   The Amended Complaint included the same six counts set forth in

---

[1] All references to "ECF___" in this Complaint are to docket filings in *Hamilton v. Speight, et al.*, No. 17-cv-0169-AB, assigned to Judge Brody, unless otherwise noted.

the original complaint.  The Amended Complaint expanded the liability claims by alleging that the GOW video games either used Hamilton's actual voice or a "sound-alike" voice.

62.    On 2/24/2017, through an attorney friend, Chasan was introduced to another attorney who provided names of attorneys in other law firms who might be interested in serving as co-counsel with Chasan and bringing financing to the case.  Chasan began to pursue these contacts while at the same time speaking with several third-party funding organizations, in order to arrange financing for Hamilton's case.

63.    On 3/8/2017, Chasan served Hamilton's First Sets of Requests for Production of Documents to Epic Games, Microsoft, and Speight.  Among other things, the Requests included: "10.  All recordings, including outtakes, of the 'Cole Train' voice that were used in the making of GOW-1, GOW-2, GOW-3, GOW-J, and GOW-4."

64.    Also on 3/8/2017, Defendants Epic Games, Microsoft and Speight filed a Motion to Dismiss the Amended Complaint (ECF 25) pursuant to Fed. R. Civ. P. 12(b)(6).

65.     Judge Brody had scheduled a pre-trial conference with counsel to be held on March 29, 2017.  Her procedures required Hamilton to submit a settlement demand to Defendants.

66.    On 3/22/2017, Defendants Epic Games, Microsoft, and Speight filed a motion to stay discovery (ECF 28).

67.     Notwithstanding that it was difficult to frame a settlement demand in Hamilton's case before discovery had occurred, Chasan, with Hamilton's authorization, sent a letter to Van Arnam and McNamara on 3/24/2017, communicating Hamilton's settlement demand of $7,500,000, without prejudice to revision after discovery had occurred.  Chasan stated in his letter that he believed the Defendants' motion to dismiss would be denied in part and granted in part, but with leave to amend.  Chasan predicted the case would proceed.

68.     On 3/28/2017, McNamara responded in writing to Chasan's and Hamilton's 3/24/2017 settlement demand letter on behalf of Defendants Epic Games, Microsoft and Speight.  Among other things, McNamara stated the $7,500,000 settlement demand had taken them aback, that their motion to dismiss had merit, and that they had not found any evidence whatsoever that Hamilton had anything to do with the development of the "Cole Train" character in the GOW video games.  McNamara concluded her letter, stating, "we do not believe it would be constructive to respond with an offer in response to a $7.5 million demand."

69.     Also on 3/28/2018, Chasan filed a brief in opposition (ECF 30) to the Defendants' Motion to Dismiss.   Chasan stated in the brief that Hamilton intended to amend the complaint again, assuming leave to amend would be granted.

70.     Counsel appeared before Judge Brody in her Chambers on

3/29/2017 for the scheduled pre-trial conference. McNamara and Van Arnam also appeared and outlined the Defendants' position as to why they believed the Amended Complaint should be dismissed. McNamara stated the parties were very far apart regarding settlement, and that trying to force negotiations at that stage would not be productive. Judge Brody said she would grant Hamilton leave to amend his amended complaint again, and the Defendants could then decide if they wanted to renew their motion to dismiss. She also stated that she would stay discovery. After considering the parties' scheduling concerns, she issued a revised scheduling order (ECF 31) that memorialized her rulings in Chambers and set new deadlines.

71.    Chasan filed Hamilton's Second Amended Complaint ("SAC") on 4/14/2017 (ECF 33). The SAC asserted five counts, as Hamilton, on Chasan's recommendation, decided to withdraw the Lanham Act count based on § 43(a)(1)(B). But significantly, the SAC added allegations that Microsoft had sold the GOW video games bundled with the Xbox One console, relying on the image and voice of "Cole Train." This allegation of commercial exploitation was devised solely by Chasan, based on research done by Chasan, and without any input from Hamilton, Conrad, Abdallah or anyone else.

72.    Defendants filed a Motion to Dismiss the SAC on 4/28/2017 (ECF 35). Chasan filed Hamilton's opposition brief (ECF 36). The Defendants filed a reply brief (ECF 39), and with leave of court, Chasan filed Hamilton's sur-

reply brief (ECF 42).

73.    During the months Defendants' Motion to Dismiss the SAC was pending, Chasan suspended efforts to enlist a third-party litigation funder and/or a co-counsel who could bring financing to the case because, obviously, everyone wanted to know what the ruling would be on the motion to dismiss.

74.    In an Order entered December 18, 2017, Judge Brody denied the motion to dismiss (ECF 43), and she issued another order setting case management and discovery deadlines (ECF 44).  In a footnote in ECF 43, Judge Brody held there were factual issues regarding Defendants' two main contentions (First Amendment, and laches), and they could not be decided on a motion to dismiss.  Judge Brody did not dismiss any of the five counts in the SAC.

75.    Beginning 12/19/2017, Chasan reactivated his efforts to enlist a third-party litigation funder and/or a co-counsel who could bring funding to the case.

76.    To the extent Chasan sought to enlist a co-counsel, it was always on the basis that the 40 percent contingency of any settlement or judgment would be split on an equal basis (20/20), with BJC Law and the co-counsel splitting the work evenly going forward.

77.    On 12/28/2017, Chasan had a conference call with defense counsel.  It was agreed that Defendants could have an extension until

1/8/2018 to answer the SAC; that the parties would exchange their initial Rule 26(a) disclosures on 1/17/2018; that Defendants would respond to Hamilton's First Sets of Requests for Production of Documents by 1/17/2018, and that Defendants would take the lead in drafting a confidentiality order for submission to the court.

78.    On 1/7/2018, counsel for the parties participated in a conference call with U.S. Magistrate Judge David Strawbridge (who had been designated by Judge Brody to oversee settlement discussions).  Microsoft's counsel, McNamara, stated the Defendants had strong defenses, and they were interested in pursuing discovery at that point, not an early settlement conference.  Magistrate Judge Strawbridge declined to set up an early settlement conference.

79.    On 1/8/2018, the Defendants filed their Answers and Affirmative Defenses (ECF 47, ECF 48).  Generally, they asserted Lester Speight was the voice actor for the "Cole Train" video game character, and that Hamilton was not involved and was unknown to both Epic Games and Microsoft.

80.    On 1/9/2018, Defendants served their First Set of Interrogatories and First Set of Requests for Production of Documents to Hamilton.  In the ensuing weeks, Chasan met with Hamilton several times to prepare responses to the Defendants' discovery requests.

81.    On 1/17/2018, the parties served their Initial Rule 26(a) disclosures.

82.    Also, on 1/17/2018, Defendants served their objections and responses to Hamilton's First Set of Requests for Production of Documents, but no documents were physically produced at that time to Plaintiff.

83.    On 1/19/2018, Chasan served Hamilton's Second Set of Requests for Production of Documents to Lester Speight.

84.    On 1/25/2018, Van Arnam and McNamara emailed a "nasty" letter to Chasan which asserted, *inter alia*, that Hamilton's case was baseless, that Hamilton and the forensic voice expert (Tom Owen) were falsely or fraudulently asserting that Hamilton's voice was used in the GOW video games, and that Hamilton and Chasan should dismiss the case or face sanctions and/or possibly a later case for wrongful use of civil proceedings. This letter is attached hereto as **Exh. C**.

85.    On 1/26/2018, Chasan emailed a responsive letter to Van Arnam and McNamara, bluntly telling them, *inter alia*, they were a pair of bullies, that they were embarrassed because they lost their motion to dismiss, that Hamilton was sincere in his belief that it was his voice in the video games, that the forensic voice expert Mr. Owen was also sincere in his opinions, that neither Hamilton nor the voice expert was guilty of any fraud, that the threats against Hamilton and Chasan were baseless, that Defendants could challenge the voice expert's opinions at trial, that Chasan had done nothing wrong in representing Hamilton so he could have his day in court, and that it was Defense Counsel who elected to pursue expensive discovery rather than

explore an early settlement.  Further, Chasan complained that their baseless

threats of sanctions and/or an action for wrongful use of civil proceedings

had caused him to put his malpractice carrier on notice of a potential claim.

This letter is attached hereto as **Exh. D**.

86.     Later, but also on 1/26/2018, one of Microsoft's counsel sent

Chasan an email with a draft confidentiality order.

87.     On 1/27/2018, Chasan met with Hamilton in Bridgeport and

Norristown, PA to work on responses to the Defendants' discovery requests.

At that time Chasan showed Hamilton the 1/25/2018 letter by McNamara

and Van Arnam (**Exh. C**) and Chasan's 1/26/2018 reply letter (**Exh. D**).

Hamilton read the correspondence and expressed his gratitude that Chasan

had defended him forcefully.

88.     Between 1/29/2018 and 2/15/2018, counsel for the parties

negotiated their differences on the draft confidentiality order, eventually

coming to agreement, and submitted it to the Court on 2/15/2018.   Judge

Brody entered it as an Order of the Court on 2/20/2018 (ECF 50), clearing

the way for the parties to exchange their document productions, with

"Confidential" or "Confidential – Attorney's Eyes Only" designations.

89.     On 2/7/2018, Chasan served Hamilton's Objections and Answers

to Defendants' First Set of Interrogatories and First Set of Requests for

Production of Documents.  In Hamilton's Answer to Interrogatory No. 3,

Hamilton identified over 50 witnesses who would testify that when they hear

the voice of "Cole Train," they are hearing Hamilton.

90.     On 2/15/2018, Chasan served Hamilton's Second Set of Requests for Production to Microsoft.   This set of document requests focused mainly on the volume and value of sales of the GOW video games bundled with the Xbox One console, and also "Cole Train" merchandise and memorabilia, such as figurines.

91.     During February 2018, counsel for the parties discussed a proposed extension of discovery deadlines.  There was agreement that there should be an extension, but disagreement as to how much of an extension there should be.  Plaintiff Hamilton sought more generous extensions, and the Defendants wanted them shorter.

92.     On 2/16/2018, Chasan mailed a letter to Judge Brody with a proposal for an extension of discovery deadlines (also stating Defendants' position) and emailed copies to the Judge's law clerk and opposing counsel.

93.     On 2/20/2018, Speight served responses to Hamilton's Second Set of Requests for Production of Documents to Speight.

94.     On 2/22/2018, Defendants filed a letter agreeing to the proposed extensions suggested by Chasan (ECF 52).  Their agreement was motivated in part by the fact that Chasan had fractured a rib on 2/19/2018 in a fall while skiing.

95.     On 2/26/2018, the parties exchanged their document productions.  Chasan sent identical thumb drives of Hamilton's and the voice

expert's materials to counsel for Epic Games and Microsoft, and also to their local counsel.  Van Arnam sent a thumb drive with Epic Games' document production.   Microsoft counsel sent an external hard drive with Microsoft's document production.  All parties marked numerous documents "Confidential" under the Confidentiality Order.

96.    On 2/27/2018, Chasan reviewed Epic Games' document production and was concerned that Epic Games had not made a complete production.

97.    On 2/28/2018, Chasan prepared Hamilton's Second Set of Requests for Production to Epic Games and served it.

98.    On 2/28/2018, Judge Brody entered an amended scheduling order (ECF 53) which set June 29, 2018 as the close of fact discovery, and July 16, 2018 as the deadline for Plaintiff's expert reports.  These were the dates suggested by Chasan and agreed to by Defendants.

99.    On 3/1/2018, Chasan sent a "meet and confer" letter to Van Arnam complaining about perceived deficiencies in Epic Games' document production.

100.  On 3/2/2018, Chasan began reviewing Microsoft's document production, but needed assistance in navigating the materials on the external hard drive.  Chasan arranged a conversation on 3/5/2018 with a paralegal working for Microsoft to discuss accessing Microsoft's documents. The materials produced included hundreds of recordings by Lester Speight of

"Cole Train" dialogue in the GOW video games.

101.  As of 3/2/2018, Chasan had contacted numerous third-party litigation funders about funding Hamilton's case, and had provided pertinent case materials including pleadings, the briefing on the motion to dismiss, the order denying the motion to dismiss, information about CONSOR and Wes Anson as the potential damages experts, and the parties' non-confidential discovery responses.

102.  Chasan could not tell the third-party litigation funders exactly what the potential damages were because the expert analysis had not yet been done.  This made it difficult for the third-party litigation funders to evaluate the risk-reward potential of the case.

103.  As of 3/2/2018, Chasan had been turned down by the following third-party litigation funders:  Rembrandt, Lake Whillans, Burford, Therium, Bentham IMF, Lex Shares, Contractor Litigation Funding, Woodsford, and Bench Walk.  Bench Walk had been located through Hamilton's own efforts.

104.  As of 3/2/2018, Chasan had discussed bringing in co-counsel with funding with approximately seven different law firms, on the basis of evenly splitting the contingency fee of any settlement or judgment but had been unsuccessful.  But as of 3/2/2018, one of the law firms was still considering it, and was doing its due diligence investigation.

105.  Between 12/19/2017 and 3/2/2018, Chasan concentrated efforts on soliciting five different law firms across the United States, including: (a)

Diamond McCarthy LLP; (b) Massey & Gail LLP; (c) Susman Godfrey LLP; (d) Siprut P.C.; and (e) Ruyak Cherian, LLP.   As of 3/2/2018, the only one of these five law firms still considering it was Ruyak Cherian, LLP.

106.  To assist the solicited law firms in their due diligence evaluations, Chasan arranged for separate conference calls for three of them with Wes Anson and other CONSOR personnel to discuss how CONSOR would go about evaluating damages in Hamilton's case, based on discovery to be produced by the Defendants, if CONSOR was retained.

107.  As of 3/2/2018, and to the best of Chasan's knowledge, the Defendants were totally unaware of his efforts to enlist a third-party litigation funding company and/or co-counsel who could provide funding for Hamilton's case and were also unaware of his lack of success.

108.  On 3/3/2018, Chasan met with Hamilton at Abdallah's office and discussed the status of discovery and other matters.

109.  On 3/7/2018, an attorney from Ruyak Cherian, LLP contacted Chasan and advised they were declining, but he gave Chasan the name of Eva Shang at Legalist, Inc. (and her email address), another third-party litigation funder, who he thought might be interested.

110.  Chasan sent Eva Shang an email on 3/7/2018 stating he was referred to her by the attorney at Ruyak Cherian, LLP and wanted to set up a phone call to discuss Hamilton's matter.

111.  Also, on 3/7/2018, Chasan received an unsolicited voice mail

message and an unsolicited email from an in-house attorney at Microsoft, Isabella Fu, Esq., who wanted to discuss the case with Chasan.

112.  Chasan returned the call to Isabella Fu.  Ms. Fu stated she wanted to open a dialog about resolving the case.  She was apologetic about the "nasty" letter sent by Van Arnam and McNamara on 1/25/2018, and she wanted to put it behind and start fresh.  She stated that if a reasonable number could be agreed to, there was a possibility of Microsoft settling the case.  She also stated that if the Plaintiff wanted an excessive number, there would be no choice but to keep litigating.   The conversation was cordial and productive, and Chasan stated he would meet with his client the next Saturday (March 10) and get back to Ms. Fu the next week.

113.  Later, also on 3/7/2018, Chasan received an email from Eva Shang inquiring about setting up a telephone call the next day.  Chasan responded by email, confirming his availability, and sent Shang and her Senior Legal Assistant, Shannon Lingren, PDF copies of the SAC (and all of its exhibits) (ECF 33), the order denying the motion to dismiss (ECF 43), and the revised case management order (ECF 53).

114.  On 3/8/2018, Shannon Lingren contacted Chasan by phone and discussed Hamilton's case.  As a result of the conversation, Chasan emailed additional materials to Lingren including BJC Law's Engagement Letter with Hamilton, Wes Anson's CV and other information about CONSOR, all the memoranda of law in support of and opposing the motion to dismiss (ECF

35, ECF 36, ECF 39, ECF 42), Hamilton's Rule 26(a) Initial Disclosures and discovery responses, the Defendants' Answers to the SAC (ECF 47, ECF 48), and the "nasty" correspondence exchanged between counsel on Jan. 25-26, 2018 **(Exhs. C, D)**.

115.   On 3/10/2018, Chasan met with Hamilton in the presence of Abdallah at Abdallah's chiropractic offices in Bridgeport, PA.  Chasan explained that the overture from Microsoft's in-house counsel presented a chance to settle the case and get something for it, especially since up until then Chasan had had no success in enlisting the aid of a third-party funding company.  Chasan also explained that without funding, there was no chance of getting a competent expert witness on damages before the close of discovery, and then Hamilton would be facing summary judgment and/or outright dismissal of his case.  Chasan proposed submitting a demand to Microsoft's in-house counsel of $950,000, explaining he doubted it would be accepted, but he felt it would be low enough to invite a counteroffer, and the parties could negotiate something in between.

116.   Hamilton, in Abdallah's presence, was not receptive to Chasan's analysis or suggestions.  Hamilton stated his case was worth millions and millions, and he would not authorize any settlement demand of less than $7,500,000.  Chasan said that that was the prior demand in March 2017, and it was promptly rejected then, and it would be rejected again, and there would be no counteroffer.  Chasan stressed that the demand had to be low

enough to invite a counteroffer, as otherwise the settlement negotiations would shut down immediately, and Hamilton would have no path forward. Chasan stressed that Microsoft had opened the door to settlement, and Hamilton's posturing would slam it shut.

117.  The discussion between Chasan and Hamilton (in Abdallah's presence) got heated and palpably angry.  Chasan thought Hamilton was being foolish and said so.  Chasan threatened to write a letter to Judge Brody asking for permission to withdraw based on a "fundamental disagreement" with his client (as permitted by Pa. R. Prof. C. 1.16(b)).

118.  Later, also on 3/10/2018, Chasan did draft a letter to Judge Brody and sent the draft via email to Abdallah to give to Hamilton. However, Chasan never did send it to Judge Brody, and hoped the draft letter by itself would encourage Hamilton to be more realistic.

119.  Soon after the 3/10/2018 argument between Chasan and Hamilton, Hamilton began to "pound the pavement" in the Philadelphia area in search of another attorney who would step in and take his case to trial, seeking the millions and millions he thought it was worth.  This effort by Hamilton began immediately after the 3/10/2018 meeting with Chasan and continued until March 19, 2018.  He did not get anyone.

120.  On 3/12/2018, Chasan wrote another letter (**Exh. E** hereto) to Hamilton, which he emailed to Abdallah to give to Hamilton, to memorialize the discussion and argument they had had on Saturday, March 10, regarding

settlement.  Portions of the letter were blunt.  But among other things, Chasan said he would not seek to withdraw because Legalist, Inc. still had the request for financing under consideration.  The letter also stated that if Hamilton had an expert report stating his damages were $10 or $15 million, it might be justifiable to submit a high settlement demand.  But without funds to hire an expert, his case was worth zero.   Abdallah advised that Hamilton did not pick up the letter for several days.

121.  Notwithstanding the friction between Chasan and Hamilton, Chasan, in pursuit of diligent efforts on Hamilton's behalf, reached out to Legalist, Inc. personnel on Monday, 3/12/2018 to ascertain the status of their evaluation.

122.  Also, on 3/12/2018, Chasan had another telephone call with Eva Shang and Shannon Lingren of Legalist, Inc. regarding details of Hamilton's case.  Shang said she had in mind introducing Chasan to another attorney to partner with.

123.  Also, on 3/12/2018, Chasan emailed a message to Isabella Fu, Microsoft's in-house counsel, stating that he did not yet have a number from Hamilton.  What Chasan meant, but did not actually write, was that he did not have a number from Hamilton that would further settlement negotiations.

### III.  THE COMING OF JOHN PIERCE AND PBBPH LAW

124.  On 3/13/2018, Eva Shang sent an email to Chasan, stating:

"Just introducing you to John Pierce.  He's got an impressive resume and has

dealt with many high-profile cases in the past.

www.pierceburnsllp/team/john-m-pierce.php.  I'll let you two connect from

here."  Shang copied Pierce on the email.   As reflected in Pierce's email

address, he was with Pierce Burns LLP.   Chasan and Pierce were complete

strangers to one another.

125.   Later, also on 3/13/2018, Chasan had a 20-minute phone call

with Pierce and his partner Carolynn Beck about Hamilton's case and the

need for third-party funding.  Chasan stated he was willing to work with a

co-counsel on the basis of a 20/20 split of the 40 percent contingency if the

co-counsel could bring funding for the case.  Pierce said he was interested,

and also stated he would contact Shannon Lingren to request that she

forward the materials that Chasan had sent to Legalist, Inc.

126.  On 3/14/2018, Pierce sent Chasan an email, stating: "We are

definitely interested in partnering up with you on this case.  Do you have

time for a call around 4 pm or so to discuss further?  I can definitely help on

the litigation finance front working with Legalist and/or other funders."

127.  Chasan responded he was available at 4 PM, and Pierce replied,

copying his partners Beck and Maxim Price, who would likely join the call.

128.   As a result of Pierce's interest, Chasan shelved the dispute he

had had with Hamilton over settlement possibilities, and intended to join the

call with Pierce, Beck and Price to present Hamilton's case favorably, but

also with honesty and objectivity in view of the risks.

129.   At the time of the 4 PM conference call with Pierce, Price and Beck on 3/14/2018, it was clear that Pierce and colleagues had read a lot of materials forwarded by Chasan to Legalist, Inc.   Pierce and colleagues were enthusiastic to get on board.  Price mentioned that he was familiar with the GOW video games and the "Cole Train" character.  Chasan discussed the need for a top-notch damages expert and mentioned his contacts with Wes Anson and CONSOR.  Chasan said that CONSOR needed a $25,000 retainer, albeit the work on an expert report might run between $175,000 and $250,000.   Chasan said he estimated the expenses to bring the case to trial were between $400,000 and $500,000.  Chasan also mentioned the case management order and discovery deadlines and emphasized there was no time to lose.  Chasan and Pierce agreed to get back in touch with Eva Shang at Legalist, Inc.

130.  On 3/15/2018, Chasan emailed a message to Eva Shang that he and Pierce were ready to move forward, and they wanted to finalize arrangements with Legalist, Inc.  Chasan copied Pierce on the email.

131.  Later, on 3/16/2018, Eva Shang responded with an email apologizing for the confusion, and stating "We [Legalist, Inc.] are at present not able to fund the case because of the uncertain damages proposition and the high request, which is why we made the introduction to John, who would be able to help lift some of the burden off you as co-counsel instead."

Shang copied Pierce on the email.

132.  Later, on 3/16/2018, Pierce emailed Chasan stating that his firm could advance the funding, and that he had other sources of funding as well, and he would draft an Engagement Agreement to reflect this.

133.  Chasan was pleasantly surprised by Pierce's enthusiasm, especially because in the 48 hours that Pierce had been looking into Hamilton's case, he could not have had the time to do the extensive due diligence that five other law firms did in declining Chasan's efforts to recruit their participation as co-counsel.  For example, Pierce did not speak with Wes Anson and CONSOR personnel to get their insights into the damages evaluation.

134.   Later, on 3/16/2018, Pierce and Chasan had a telephone conversation.  Pierce said he would be in New York City on March 19 for a mediation, and he would like to go to Philadelphia on March 20 to meet with Chasan and Hamilton and get an Engagement Agreement signed.

135.  Chasan followed up the conversation with an email on 3/16/2018 supplying Pierce with some sample motions for *pro hac vice* admission to the Federal Court in Philadelphia, and he urged speedy preparation of the *pro hac vice* motions, in view of the 6/29/2018 discovery deadline.    Chasan said he was looking forward to reviewing with Hamilton the draft Engagement Agreement that Pierce would send.   Chasan mentioned the necessity of sending a $25,000 retainer to CONSOR, so that the damages

experts could get started.

136.  Pierce responded with an email on 3/16/2018 stating he intended to send a draft Engagement Agreement that day, and that he could get the $25,000 retainer wired to CONSOR by the end of the month.

137.  At 7:08 PM EDT on 3/16/2018, Pierce emailed the draft Engagement Agreement to Chasan.  A copy is attached as **Exh. F**.  It stated it was an engagement between Hamilton and Pierce Bainbridge Beck Price & Hecht LLP.  Pierce stated in his email: "Looking forward to getting on board with you!"  Pierce followed with another email, explaining: "Note our firm name is changing due to our extraordinary growth.  The new web site will go live next weekend."

138.  Chasan emailed the draft PBBPH Law Engagement Agreement to Abdallah and Conrad and requested that Abdallah supply it to Hamilton, and let Hamilton know that there is now a source of funding, and that Chasan needed to meet with Hamilton on 3/17/2018.

139.  After a preliminary review of the draft PBBPH Law Engagement Agreement, Chasan emailed some comments to Pierce on 3/16/2018, including that it "should probably state how it dovetails with my agreement with Hamilton."  This was mentioned because the draft Engagement Agreement stated PBBPH Law would get a 20% contingency of the net recovery, but it made no mention of BJC Law's Engagement Letter with Hamilton.  Pierce followed with another email stating that changes could be

made easily, and it could specify dovetailing.   He added: "Feel free to

redline."

140.   Chasan sent Pierce an email on 3/17/2018 with detailed

comments on the draft Engagement Agreement and attached copies of BJC

Law's Engagement Letter with Hamilton, and the Court's Confidentiality

Order (ECF 50).  Chasan made the following comments (among others):

> 1.  It's really a three-way agreement, not a two-way
> agreement.  Reading my EL [Engagement Letter] and your
> EA [Engagement Agreement] together, Skip gives up 40
> percent to me and 20 percent to you.  Now that is not what
> we intend.  So we have to make it read like we intend…..
>
> 2.  One area of conflict is Para. 10.  You provide the client
> has the absolute right to accept or reject a settlement.  My
> EL states that if he refuses a settlement offer that I
> recommend, I have the right to withdraw.  So we have to
> harmonize this…..
>
> 5.  On communications with the client, Skip does not own a
> computer, and does not have an email account.  He has a
> smart phone, but all email communications are routed thru
> Ray Abdallah's chiropractic office.
>
> 6.  Who is the primary contact with Skip going forward?  Me
> or you?  This is something on which we have to be on the
> same page.  We don't want disputes based on Skip saying
> Chasan told me X but Pierce told me Y.  (See para. 4 of your
> draft EA.)….
>
> 8.  On paragraph 8, costs and expenses, Hamilton to date
> has paid out about $6700 in costs.  Would you reimburse
> that?  If not, probably you should have a sentence excluding
> his advances (but noting he gets his expenses reimbursed
> from a settlement or judgment off the top).
>
> 9.  Also on paragraph 8, I think you should mention that
> estimated expenses to take the case to trial are $400,000 to
> $500,000.  If I were you, I would ask for a 150 percent

return on your advances to compensate for the risk.  Frankly, I think Skip would accept that, because he knows litigation funders get 300 percent return.

10.      You should probably put in a term that you reserve the right to transfer the expense disbursements to any willing third-party funder, and the client should expect the third party funder to expect a return of 300 percent.

11.      You should probably have a sentence that the advances of expenses are without recourse if (unhappily) the case goes south.

12.      On conclusion of services, you should probably mention that client is not entitled to receive the defendants' confidential documents that are produced in discovery under the Confidentiality Agreement.  See attached Confidentiality Agreement.

141.  Chasan did not meet with Hamilton on 3/17/2018 and was unable to reach him by phone.  However, Conrad was able to reach Hamilton on 3/19/2018, and advised Chasan that Hamilton wanted to bring his friend John Henderson (who is not an attorney) to the meeting with Pierce on 3/20/2018, but Henderson was unavailable, so Hamilton wanted the meeting postponed.   Chasan requested Conrad to tell Hamilton that Pierce was coming from California, that the meeting could not be postponed, and he should not bring anyone to the meeting who was not his attorney.  Conrad relayed this message.

142.  Microsoft's in-house counsel Isabella Fu emailed Chasan on 3/19/2018, requesting whether there was any update from Hamilton.  Chasan, aware of the scheduled meeting with Pierce on Tuesday, March 20, responded to Ms. Fu: "Nothing yet.  There may be something by Wednesday

or Thursday."

143.   Chasan reached Hamilton by phone at about noon on 3/20/2018.  Hamilton confirmed he would be at the meeting with Pierce later that afternoon but stated he might bring someone.  Chasan said he should not bring anyone who was not his attorney.

144.   Hamilton arrived at Chasan's office at about 3:00 PM on 3/20/2018, accompanied by his friend Troy Davis.  Davis is not an attorney, but Hamilton said he wanted Davis there to take notes.    Davis had been listed as a potential lay person voice identification witness in Hamilton's answers to interrogatories.

145.   Pierce arrived at Chasan's office approximately a half hour after Hamilton and Davis, and all four met in a conference room for approximately 90 minutes.  Particulars of Hamilton's case were discussed, and particulars of the Engagement Agreement were discussed.  Pierce stated his firm was capable of advancing $400,000 to $500,000 for litigation expenses, even if a third-party litigation funder was not located.  Pierce stated his firm would likely reimburse Hamilton for the $6700 in expenses that Hamilton had funded to date.  (The $6700 included over $3500 that Hamilton had paid his voice identification expert, Tom Owen.)  Hamilton reacted well to Pierce, and Pierce acknowledged the Engagement Agreement needed revision.  Davis listened but did not take any notes.

146.  After Hamilton and Davis left Chasan's offices, Pierce asked if

there was a notary present in the suite who could attest his signature on a contract.   There was, and the notary did attest Pierce's signature on the contract that Pierce provided.  Chasan was present when the contract was signed and attested.  Pierce asked Chasan to scan the contract and email it to him as a PDF, and Chasan did so.     The particular contract is attached as **Exh. G**.  It is a contract between Pravati Capital, LLC and PBBPH LLP, and is titled "Law Firm Legal Funding Contract & Security Agreement."  Chasan did not read it at the time.  Soon thereafter, Pierce left for the Philadelphia airport.

147.  Later in the evening on 3/20/2018, Microsoft's counsel served Microsoft's Objections and Answers to Hamilton's Second Set of Requests for Production of Documents to Microsoft.   Chasan did an initial review of Microsoft's responses, and then forwarded the document via email to Pierce, stating he was not satisfied with Microsoft's responses to Requests Nos. 2, 6, 7, 18 and 19, as Microsoft stated it would not fully respond to those requests.

148.  On 3/21/2018, Chasan drafted a "Meet-and-Confer" letter to Microsoft's counsel, in connection with Microsoft's objections to Hamilton's Second Set of Requests for Production, as a preliminary to any discovery motion.  Chasan emailed the draft letter to Pierce, stating he wanted to send it out by March 23, but he also wanted to give Pierce an opportunity to review it and make comments, as they would be working together.

149.  Hamilton left Chasan two voicemails early on 3/22/2018, stating he wanted to have another conference with Pierce and Chasan and his "team," which would include John Henderson, his publicist, Jonathan Bridges (a financial advisor), and his friend Nicholas Epps.  After discussing all issues in a conference call or another meeting, he wanted to make the decisions relating to his case.   He also said he had left a voice mail for Pierce.

150.  Later, on 3/22/2018, Chasan spoke by phone with Pierce, and expressed concern about Hamilton wanting to bring in his "team" of non-lawyers.  They also talked about revising the engagement agreement, and getting it finalized, and Pierce said he intended to make revisions that day.

151.  Later, on 3/22/2018, Chasan reached Hamilton by phone. Hamilton confirmed he wanted his "team" involved, but Chasan stated he should rely solely on his lawyers.  Hamilton said he would be able to sign the revised engagement agreement as soon as Pierce sent it.

152.  As of 3/23/2018, Chasan had not received a revised engagement agreement from Pierce, nor had he received any comments on the draft "meet and confer" letter to Microsoft counsel.  Chasan emailed Pierce requesting the status, and Pierce responded late in the day that he was swamped but would get to it later that evening or the next day.

153.  Also on 3/23/2018, Isabella Fu emailed Chasan again asking if they could talk Monday (March 26).  She stated: "I think it would be good to talk before further investment in this case."  Following exchange of emails

40

on scheduling, Chasan and Ms. Fu agreed to speak at 11:30 AM EDT on Tuesday, March 27.

154.  On 3/24/2018 at 12:50 EDT, Pierce emailed Chasan, stating: "I need to be out on the East Coast again next week.  Can I swing by your office first thing Monday to nail everything down?  Will review meet and confer letter this weekend."   Chasan responded that he had an appointment Monday morning, but he was available beginning at 2 PM, and asked Pierce to send the revised draft engagement agreement ASAP.

155.  Chasan sent Pierce another email on 3/25/2018, stating: "We need to finalize the agreement.  We cannot expect any agreement from defendants on another discovery extension.  Just over three months to go. No more time to lose.  Make it short and simple.  Incorporate my engagement letter and put in the bare minimum to make it work.  Thanks."

156.  Pierce responded via email on 3/25/2018: "I will look at letter today so we can get [it] out tomorrow but let's nail down engagement stuff in afternoon in person. Can we meet at your office at something like 2 pm just me and you for a couple hours?"  Chasan replied, "Yes."

157.  Pierce arrived at Chasan's office shortly after 2 PM EDT on March 26.  He did not have a revised engagement agreement.  He stated he had had telephone conversations with Hamilton, and Hamilton wanted him to take over the lead on the case.  It was unclear whether Chasan would remain as local counsel, but that possibility was discussed, and various

scenarios were discussed concerning the division of the contingent fee. Chasan explained to Pierce that Hamilton's recent dissatisfaction with Chasan stemmed from their disagreement over how to posture a settlement demand in response to the overture from Microsoft's in-house counsel. Chasan allowed Pierce to listen to a number of voice mail messages from Hamilton in which Hamilton complained that a million dollars was not good enough, and he needed a much more substantial sum.  Chasan also gave Pierce a copy of his 3/12/2018 letter to Hamilton (**Exh. E**, hereto), and discussed it with Pierce, stating that it had evolved as a result of the settlement overture from Microsoft's General Counsel's office.

158.    Chasan also explained to Pierce the considerable professional efforts he had made on behalf of Hamilton, and he provided Pierce with the BJC Law monthly invoice to Hamilton, dated 3/8/2018, for accrued fees as of 2/28/2018, showing $295,127.35 owed to BJC Law.

159.  Chasan stated that despite his disagreement with Hamilton on how to posture settlement negotiations, he had diligently presented Hamilton's case to Legalist, Inc., and to Pierce, in an effort to secure litigation funding.

160.  Chasan told Pierce he had solicited approximately 10 third-party litigation funders, and all had turned him down.  Chasan named many of the third-party litigation funders, and Pierce said he was unfamiliar with Bench Walk, and wrote it down for future reference.

161.  On the merits of the case, Chasan told Pierce that the Defendants had evidence that Speight was the actual voice over actor for "Cole Train," and thus Hamilton's case most likely had to be postured as a "sound alike" case, alleging that Speight had imitated Hamilton's voice. However, anyone could see that if the "Cole Train" voice was not actually Hamilton's, as alleged in the original Complaint, the case would have much less jury appeal.

162.  The engagement agreement was not finalized.  The "meet-and-confer" letter was not finalized.

163.  Chasan mentioned he had a scheduled call to Microsoft's in-house counsel, Isabella Fu, the next day, and suggested postponing it.

164.  Chasan and Pierce walked over to the Marathon Grill at 16th and Sansom Streets in Philadelphia to get a bite to eat.  Pierce discussed working with Chasan on other matters in the future.   Pierce invited Chasan to consider joining his growing firm as a contract attorney or employee.  Pierce stated he was looking to bolster his staff of attorneys with additional experienced litigators.

165.  Pierce departed Chasan's offices later in the afternoon on 3/26/2018, stating he was taking Uber to the Philadelphia airport.

166.  Later, on 3/26/2018, at 7:33 PM, *The American Lawyer* posted an article online, titled "Ex-Big Law Partner's Boutique Has Both a New Name, Office," by Meghan Tribe (**Exh. H**).  The article featured a photograph

of Pierce and described his prior sojourns with K&L Gates and Quinn

Emanuel, and stated his new firm, now known as Pierce Bainbridge Beck

Price & Hecht "has set up shop in New York after adding former Jones Day

and Quinn Emanuel associate Maxim Price…."   It stated Pierce's boutique

had "brought on Beverly Hills-based solo practitioner James Bainbridge."

167.  *The American Lawyer* article also stated Pierce had left K&L

Gates in 2016 to form Pierce Sergenian, "a boutique seeking to make a

name for itself on several high stakes contingency matters, including a battle

against Snapchat….."

168.  *The American Lawyer* article also stated Pierce Sergenian had

"struck a deal with Scottsdale, Arizona-based litigation financier Pravati

Capital to become perhaps the first public example of a litigation funder

investing in a firm's current and future contingency fee cases that it has

against large companies like Snap."

169.  *The American Lawyer* article quoted Pierce: "[We're] being very

aggressive in taking big contingency fee cases using litigation funding in a

pioneering way, which we're doing."

170.  *The American Lawyer* article also quoted Pierce on the expansion

plans of PBBPH Law: "We're looking for Navy Seal, Army Ranger types –

really aggressive litigators who want to be on a great platform and litigate

great cases."

171.  The "Pierce Bainbridge Trial Lawyers" web site went "live" on or

about 3/26/2018.   Pierce's biography on the web site (**Exh. I**) stated he was the managing partner and quoted several articles extolling his acumen as a trial lawyer.  It also stated: "Mr. Pierce has successfully handled contingent and alternative fee matters, often working with third party litigation funders who assist individual and corporate clients to finance large, meritorious plaintiff-side claims."

172.   On 3/27/2018, Chasan emailed Isabella Fu, stating that he had to postpone their scheduled conference call due to an emergency.  It was a pretext, but Chasan had nothing to propose.   Chasan also emailed to Pierce, stating, *inter alia*, he had postponed the call with Ms. Fu, and adding: "Of course, I still did not send the Meet-and-Confer letter that I had intended to send last Friday.  Getting a speedy resolution of the representation issues with Skip Hamilton is an absolute necessity, as every minute of delay prejudices his ability to complete discovery [to] put on an effective case."

173.   Later, on 3/27/2018, Chasan sent another email to Pierce stating: "I am still his only counsel of record.  I am well aware of the case management deadlines and discovery deadlines.  I would have sent the Meet and Confer letter to Microsoft last Friday, but delayed to give you an opportunity to review and provide any input.  I wasn't expecting a lot of input, but I wanted to give you the courtesy….   So tomorrow I am sending [Microsoft trial counsel] Ambika Doran the Meet and Confer letter and I will remind her that the document production is overdue.   I see no reason to

delay any more, especially when I have no idea how long it will take to sort out Plaintiff's arrangements."

174. Pierce responded that evening with his own email, stating: "Hi Bruce. Sorry for the delay in responding. Skip has actually decided to cut ties altogether. He has signed a letter terminating the engagement and would like us to take things over, including revising and sending the meet and confer letter. He has asked me to send the termination letter along, which I will do tonight or first thing in the morning." He followed that with another email that he copied to Beck, stating: "Carolynn, can you please send to Bruce?"

175. The next morning, 3/28/2018, Beck emailed Chasan, attaching Hamilton's termination letter (**Exh. B**). *See ante*, ¶ 31.

176. Upon information and belief, Pierce routinely kept his co-managing partner Bainbridge and the other partners (such as Beck, Price and David Hecht) informed about developments in Hamilton's "right of publicity" case, including the March 20 and 26, 2018 meetings at offices of BJC Law, and also about information received from Chasan, including Chasan's 3/12/2018 letter to Hamilton (**Exh. E**).

177. On information and belief, on 3/26/2018 and 3/27/2018, Pierce disparaged Chasan to Hamilton, and failed to mention that Chasan had been aggressively urging Pierce to send a $25,000 deposit to CONSOR to get the damages experts on board in view of the short fact discovery deadline, and

had drafted a "meet-and-confer" letter to Microsoft's counsel regarding

insufficient discovery responses, and was urging quick *pro hac vice* motions

to accelerate PBBPH Law attorneys into the case to work on discovery.

178.  Hamilton's termination letter made no provision for payment of

BJC Law.

179.  In transmitting Hamilton's termination letter, neither Pierce,

Beck, nor PBBPH Law made any provision for any payment to BJC Law.

180.  Neither Hamilton, Pierce, Beck nor PBBPH Law made any

provision for division of a contingency fee with BJC Law in the event of a

verdict or settlement of Hamilton's case.

181.  On 3/28/2018, after receipt of Hamilton's termination letter,

Chasan sent the following email to Beck and Pierce:

Carolynn and John,

1.      Most of my file is electronic.   Probably the way to do this
is to copy it to an external hard drive and send you the hard
drive.  However, there is a problem.  My file includes the
defendants' confidential document productions.  I cannot forward
those materials to you until you have entered your appearances.
Otherwise I would be in violation of the Confidentiality Order.  In
any event, I would want payment for my time and expenses.

2.      There are some paper materials that can be boxed and
shipped.  But again, I want payment for my time and expenses.

3.      There is another problem, and a bigger problem.  Per my
Engagement Letter with Mr. Hamilton (copy attached), he is
"obligated to pay us in full at our regular hourly rates and/or
fixed fees for all of our past services and expenses."  See
paragraph 11.  Skip's Termination Letter does not address how
he will accomplish this.   In my meeting with John on Monday
[March 26], we discussed in general terms a buyout, but did not

put anything down in writing.  So we need to discuss this, and
very fast.   I may be amenable to releasing all claims against
Skip and Pierce Bainbridge in return for full payment of my law
firm's outstanding invoices and current billings (currently
estimated to be between $320,000 and $330,000).

4.     I anticipate that even after you receive my file, you will
need to speak to me about particulars in the file for a period of
time, perhaps a month or more.  That could be very time
consuming on my part.  I am amenable to working with you as
needed, but at sufficient hourly rates.

So, John, let's continue the discussion we started on Monday,
and work this out.   Thanks.

182.  It was unknown to Chasan at the time, but Chasan learned later

from Conrad that Pierce had had a meeting with Hamilton and his "team"

(reportedly including John Henderson, Troy Davis, Nicholas Epps and others)

at the Marriott in West Conshohocken, PA on or about 3/26/2018.  Pierce did

not mention this to Chasan.

183.  Conrad also reported to Chasan in due course that Pierce had

paid Hamilton approximately $6700 for his litigation costs (including

reimbursement of the $3500+ fee paid to Tom Owen, the forensic voice

expert), and had set him up with an email account (and presumably a

computer), and paid for rental housing for Hamilton in the Los Angeles area,

where he could work with Hamilton near his offices.   Chasan would learn

much later that the rental property was in Thousand Oaks, CA, that

Hamilton's son David had also moved in, and Pierce had hired David to work

in the PBBPH Law offices in Los Angeles.

184.   On 3/29/2018, Isabella Fu emailed Chasan again about possible

settlement, and invited Chasan to get in touch.  Chasan responded to the email that day as follows: "Thank you for your patience.  I am sorry I have to be so obtuse (assuming 'obtuse' is a word that fits the situation).  At this time Mr. Hamilton has not authorized me to communicate a settlement demand.  I don't know what else to say."

185.   On 4/2/2018, Chasan emailed Pierce and Beck a copy of Hamilton's invoice for the month of March 2018, showing an outstanding cumulative indebtedness of $319,240.78.  In another email sent that day, Chasan again requested Pierce and Beck to resolve the issues mentioned in Chasan's 3/28/2018 email.  *See ante*, ¶ 181.

186.   On 4/4/2018, Pierce sent an email to Chasan, with a copy to Beck, stating: "I have an idea for wrapping up your engagement, and we need to get admitted and substituted in. We will reach out to Microsoft's counsel as well.  What time works for you prior to 12:30 pm Eastern?"

187.   Pierce called Chasan later on 4/4/2018.  He said PBBPH Law did not have the money to pay Chasan's fees, but he had an idea.  The idea was to purchase an insurance policy that would fund Chasan's fees at the conclusion of the case.

188.   To Chasan, Pierce's statement, that his firm did not have the money to pay the attorney's fees of BJC Law, was inconsistent with his representation at the 3/20/2018 meeting that the firm would fund $400,000 to $500,000 in litigation expenses to take Hamilton's case to trial.

189.   After the 4/4/2018 call, Pierce sent an email to Brett McDonald and James Blick of The Judge Global Group, copying Chasan, and stating: "Would like you to explain ATE products to him [Chasan]. We are taking a case over from him (that Gears of War case I sent you the WaPo article on), and I want to help client find a way to make sure the value of his time is compensated.  I think an ATE policy may be at least a part of a potential solution here.  Also, can you please shoot to Bruce some literature on ATE insurance generally and perhaps on The Judge as well?"

190.   On 4/5/2018, Chasan had a brief conference call with Van Arnam and McNamara in response to their request to discuss the next steps in discovery.  McNamara advised she had received a voice mail message several days before from Carolynn Beck advising that there would be a substitution of counsel.  Chasan stated it was his understanding that it would be a complete substitution.

191.   On 4/5/2018, Chasan had a 45-minute telephone call with Messrs. McDonald and Blick and came away with the impression that the types of insurance they marketed were not a solution for payment of Chasan's legal fees.  But they mentioned that Pierce had not yet submitted an application, so nothing had been submitted to underwriting.

192.   Later, on 4/5/2018, Chasan sent an email to Pierce with a memo summarizing the outcome of his conversation with Messrs. McDonald and Blick.  As the insurance avenue did not look promising, Chasan

suggested that PBBPH Law and its partners pay the $319,240.78 in unpaid fees, but on an instalment basis over 12 months, and with personal guarantees of the partners.   Chasan offered to give PBBPH Law and its partners a full release.  Chasan also proposed venue for any collection suit in Philadelphia, with the creditor having the right to be awarded reasonable attorney's fees.

193.   Chasan stated in the 4/5/2018 memo that if PBBPH Law was willing to finance the case with $400,000 to $500,000 of funding, for a 20 percent stake in the contingency, then the firm should be willing to pay an additional $320,000 to BJC Law for a full 40 percent stake in the contingency.

194.   On 4/9/2018, Chasan emailed Pierce regarding the status of the request for payment of attorney's fees, but Pierce did not respond.

195.   On 4/11/2018, McNamara emailed Chasan that she had had a conversation on 4/9/2018 with Beck, and Beck confirmed there would be a substitution of counsel.

196.   On 4/12/2018, Brett McDonald emailed Chasan, in response to Chasan's inquiry, that Pierce had not yet submitted an insurance application, and he (McDonald) believed the attorney's fee indebtedness would not be insurable.

197.   On 4/12/2018, Chasan emailed Pierce and Beck inquiring, *inter alia*, about payment of his attorney's fees, when they intended to enter their

appearances in Hamilton's case, and requesting to set up a telephone call. Neither Pierce nor Beck responded.

198.   On 4/19/2018, Chasan emailed Pierce and Beck again, inquiring whether they intended to resolve the attorney's fees issue amicably.  This time Pierce responded, stating that his firm had no contractual relationship with Chasan, and anything he did to assist Chasan in getting paid was "gratuitous."  As a result of this impolite response, Chasan concluded that Pierce and PBBPH Law had no intention of paying his attorney's fees.

199.   On 4/20/2018 two attorneys from Stradley Ronon Stevens & Young, LLP (Joe N. Nguyen, partner, and Benjamin E. Gordon, associate), of Philadelphia, entered appearances for Lenwood Hamilton (ECF 54, ECF 55).

200.   Based on custom and practice, it is inferable that the Stradley Ronon attorneys would not be working on contingency, but on hourly rates, and would earn substantial fees while working as local counsel for Hamilton.

201.  Hamilton had no resources to pay hourly rates; it is therefore inferred the Stradley Ronon lawyers were retained directly by PBBPH Law.

202.  On 4/26/2018, the Stradley Ronon attorneys filed motions for *pro hac vice* admission in Hamilton's "right of publicity" case for Pierce, Beck and Price (ECF 56, ECF 57, and ECF 58), respectively.  Later they would do so for other PBBPH lawyers, including Hecht (ECF 93, 94).

203.  On 4/26/2018, Chasan filed his Withdrawal of Appearance on behalf of Hamilton (ECF 59).

## IV.  THE PRAVATI – PBBPH LAW AGREEMENT

204.  While the Pravati - PBBPH Law Agreement (**Exh. G**) is attached
as an exhibit to this Complaint, and speaks for itself, certain key provisions
are summarized here to give greater context to Plaintiffs' claims.

205.  It is assumed that Pravati countersigned the Agreement (which
is obviously one of its own forms) after Pierce affixed his signature on
3/20/2018 in Philadelphia before a public notary.

206.  Based on *The American Lawyer* article (**Exh. H**), the Pravati –
PBBPH Law Agreement appears to be similar to agreements Pravati had with
Pierce's prior law firms, including Pierce Sergenian and Pierce Burns.

207.   In the Agreement (**Exh. G**), Pravati agreed to make legal
funding to PBBPH Law secured by contingency fees and expense
reimbursements in connection with a portfolio of current and future cases.
(**Exh. G**, p. 1; p. 6, ¶ 5).  PBBPH Law granted Pravati a perfected first
priority security interest in the proceeds from the portfolio.  (***Id.***).  PBBPH
Law had the right and responsibility to make all legal and strategic decisions
in the handling or settlement of the portfolio.  (***Id.***).

208.  Page 18 of the Agreement had "Schedule B" which comprised a
list of 19 matters (clients) then being handled by PBBPH Law that were
subject to Pravati's security interest and said list could be amended from
time to time.  In fact, PBBPH Law was required to revise and update
Schedule B when it acquired additional future cases.   (**Exh. G**, p. 6, ¶ 5).

209.  Pages 3-4 of the Agreement defined circumstances (i – xiv) when PBBPH Law would be in default.  No. (ii) refers to circumstances when PBBPH Law transfers or encumbers its interest in any case to another law firm, including the right to fees; but it is not a default if PBBPH Law abandons a client, or if the client terminates PBBPH Law and grants to another law firm a contingency fee, provided PBBPH Law "continues thereafter in good faith and in a commercially reasonable manner to pursue collection of the contingency fee earned by [PBBPH Law] in connection with such Case prior to such abandonment or termination."

210.   Page 8, ¶ 10 further specified Pravati's remedies in the event PBBPH Law is discharged from a case.  It states "PRAVATI shall have the right to protect its interest … in the continuation of the Client's case ensuring that PRAVATI automatically and immediately receives any fees and costs payable to [PBBPH Law]."

211.   Page 5, ¶¶ 3-4 of the Agreement made clear that advances and payments from Pravati to PBBPH Law may be used for, *inter alia*, the law firm's operating expenses, or to refinance the law firm's existing debt, or to pay federal, state and/or local taxes.

212.  At pages 6-7, ¶ 6, the Agreement provided that PBBPH Law and Pravati each receive 50 percent of the proceeds earned on each case.

213.   At page 14, ¶ 25, the Agreement specified that PBBPH Law will indemnify and defend Pravati, and hold Pravati harmless "against any and all

liability….damages….causes of action, claims and/or judgments …"

214.   Schedule A ("Term Sheet"), at p. 17 of the Agreement, listed the total advanced to PBBPH Law as $327,700 "Per This Agreement," and "Total Amount Funded Thus Far Per All Prior Agreements Against the Collateral List of Cases in Schedule B - $1,172,200.00."

215.   Pages 20-25 of the Agreement was Schedule D, a "Limited Guarantee Agreement" signed by Pierce.

216.   Pages 26-27 of the Agreement was Schedule E, "Non-Disclosure Agreement."

217.   On information and belief, based on published materials which became known to Chasan much, much later, Pierce and PBBPH Law provided Pravati Capital with a memorandum on or about May 6, 2018, stating that Hamilton's "right of publicity" case was worth a huge sum of money, possibly $1,000,000,000 ($1 billion) in damages.  Pierce used this memorandum to solicit funding from Pravati Capital to support the financing of Hamilton's case, and also to fund salaries of attorneys then at PBBPH Law and also attorneys that PBBPH Law intended to hire.

218.   Also on information and belief, based on published materials which became known to Chasan much, much later, Pierce and partners used the May 6, 2018 memorandum to Pravati Capital as a recruitment tool in soliciting other attorneys to join PBBPH Law.

219.   In Chasan's view, and upon information and belief, the May 6,

2018 memorandum that Pierce submitted to Pravati Capital grossly exaggerated the merit and value of Hamilton's "right of publicity" case.  Also on information and belief, Pierce did not provide Pravati Capital with more sober assessments of the case, such as the Van Arnum-McNamara "nasty" letter dated January 25, 2018 (**Exh. C**), or Chasan's March 12, 2018 letter addressed to Hamilton (**Exh. E**)**.**

## V.   FAILED SETTLEMENT NEGOTIATIONS; THREATS; ETC.

220.  On 4/27/2018, Chasan notified Pierce by email that he and BJC Law were preparing to file a complaint against him and PBBPH Law to recover legal fees for BJC Law's representation of Hamilton.  Chasan contemplated, but did not expressly disclose, that the claims to be asserted were tortious interference with contractual relations and unjust enrichment.

221.   On 4/30/2018, Pierce initiated settlement negotiations to dissuade Chasan from filing suit.   His email began with a threat: "This e-mail is to advise you that Skip Hamilton has now authorized Pierce Bainbridge to file, on his behalf, a multi-million dollar, eight-figure legal malpractice action against you. Before any lawsuits are filed on either side, I am reaching out to you in an effort to calmly, amicably, and in good faith attempt to work this out.  If we are unable to do so, you can expect that Pierce Bainbridge will file Skip Hamilton's malpractice complaint against you, and we anticipate representing him throughout the case."

222.  On 4/30/2018, Chasan responded to Pierce's email, stating: "If

you are not already aware, a malpractice case in Pennsylvania has to be supported by a certificate of merit.  I am doubtful you will ever be able to get such a certificate from a detached, qualified professional."  But further, Chasan's email outlined specific terms for a settlement, and Chasan refrained from filing the lawsuit while settlement was being explored.

223.  Nonetheless, because of the threat in Pierce's 4/30/2018 email, Chasan promptly notified his malpractice carrier of a potential claim from former client Hamilton.

224.  On May 1, 2018, via a detailed email, Pierce initiated settlement negotiations with Chasan to resolve the attorney's fees dispute, proposing terms that he urged be accepted, and stating thereafter the disputants could provide "mutual releases."  Pierce's email included arguments as to why Chasan's proposed action lacked merit.  Chasan responded via email that same day stating he would hold off filing a complaint in order to consider Pierce's proposal.

225.  Pierce's 5/1/2018 email to also made mention of "Mr. Hamilton's [potential] malpractice and breach of fiduciary duty lawsuit against you [Chasan]."   There was no explanation by Pierce at that time what he meant by "malpractice" or "breach of fiduciary duty."

226.  In view of Pierce's settlement overture and retaliatory threat of launching a malpractice lawsuit, Chasan and BJC Law refrained from filing suit and engaged with Pierce for a period of more than four months in

exchanging settlement proposals, which extended to September 15, 2018. All such settlement communications were conducted via email, often with attached memos and letters.

227.  Between May 5 and 11, 2018, PBBPH Law and Chasan arranged for the transfer of Hamilton's case file (including electronic materials) to the new local counsel, Stradely Ronon et al., for an agreed sum for eight hours of Chasan's time in assembling and inventorying everything.  At that point, *pro hac vice* admissions had been granted, and the PBBPH Law and Stradley Ronon attorneys were all bound by the Confidentiality Order (ECF 50).

228.  In May 2018, Chasan and Pierce traded differing settlement proposals regarding BJC Law's demand for attorney's fees.  In a memo to Chasan dated 5/21/2018, Pierce elaborated on his threat if the parties did not settle:  "[W]e will likely defend against you by filing a cross-complaint, claiming, among other things, that your failure to bring the critical causes of action for fraud, intentional concealment, and negligent misrepresentation with a concomitant demand for disgorgement of unjust enrichment (profits), plus pre-judgment interest – all based on these three new causes of action – combined with your failure to discover critical information through the discovery process, has seriously harmed the case and overall recovery," and thus, Chasan and BJC Law would be "entitled to nothing."  While this explained what Pierce meant by "malpractice," it did not explain what he had meant by "breach of fiduciary duty" in an earlier email.

229.  Chasan responded via email on 5/21/2018: "If you and Hamilton believe that Epic Games, Microsoft and/or Speight are guilty of fraud, intentional concealment, and/or negligent misrepresentation, you are welcome to serve discovery to them now to obtain evidence (and take depositions) to support those theories of recovery, and you are welcome to file a motion for leave to amend the Second Amended Complaint once again. I am not stopping you.  Discovery is still open.  Good luck with those far-fetched theories."

230.  On 6/15/2018, just 14 days before the then fact-discovery cut-off date, Pierce filed a motion and declaration in Hamilton's "right of publicity" case seeking an extension of discovery deadlines for several months to enable PBBPH Law to develop evidence that would support a Third Amended Complaint alleging fraud, intentional concealment and negligent misrepresentation.  (ECF 63, ECF 63-1, ¶¶ 4-5).

231.  In the Memorandum of Law in support of the motion for discovery extensions, Pierce argued, *inter alia*, that Hamilton's request was occasioned by an injury to his former counsel (Chasan): (1) "In late February 2018, former counsel for the plaintiff notified the court that he had suffered an injury, could not engage in discovery, and requested a short continuance to accommodate his condition."  (ECF 63-2 at page 4 of 9); and (2) "[T]he defendants were not disabled…from continuing to engage in discovery while plaintiff's prior counsel was disabled for approximately 70

days…"  (ECF 63-2 at page 5 of 9).

232.   Pierce also argued: "The plaintiff's new counsel believes there is much needed evidence that will be obtained from discovery that is related to the above-stated three new causes of action, *which plaintiff's prior counsel [Chasan] had not directly explored*."   (ECF 63-2 at page 8 of 9) (italics added).

233.   Pierce's statements to the Court that Hamilton was hampered in discovery for 70 days due to Chasan's [skiing] injury were knowingly false.

234.   Chasan had proposed an extension of discovery deadlines via a letter to Judge Brody on 2/16/2018.  (ECF 51 at pages 3, 4, and 5). *See ante*, ¶ 92.   On 2/21/2018, Chasan notified Judge Brody and opposing counsel via email that he suffered a broken rib in a skiing accident on Monday, 2/19/2018.  (ECF 51 at page 1 of 5).  Chasan's email did not say he was disabled from participating in discovery.  (*Id.*).  Per letter dated 2/22/2018, counsel for defendants agreed to the revised proposed deadlines in Chasan's 2/16/2018 letter to Judge Brody.  (ECF 52).   *See ante*, ¶ 94.

235.   Chasan also had produced Hamilton's document production on 2/26/2018 and sent a "meet and confer" letter to counsel for Epic Games on 3/1/2018.   *See ante* at ¶¶ 95, 99.  Chasan also drafted a "meet and confer" letter to Microsoft's counsel on 3/21/2018.  *See ante* at ¶ 148*.*  Chasan met with Pierce in person on 3/20/2018 and again on 3/26/2018.   *See ante* at ¶¶ 144-145, 156-157.  Chasan was not in any disabling condition due to the

broken rib suffered on 2/19/2018, and Pierce could readily see that.   In fact, on 3/26/2018, Chasan and Pierce left Chasan's office at 1500 JFK Boulevard and walked to the Marathon Grill at 16th and Sansom Streets, where they ordered food.  *See ante* at ¶ 164.   The representation to the court by Pierce that Chasan was "disabled for approximately 70 days" was entirely and knowingly false.

236.   Chasan did no further work on discovery as of the time he was terminated by Hamilton on 3/28/2018.   In fact, later that day, Microsoft emailed Chasan with directions for accessing Microsoft's documents "in the cloud" produced in response to Hamilton's Second Set of Requests for Production of Documents and Things, which Chasan had served on 2/15/2018.  *See ante* at ¶ 90.  Chasan saved the 3/28/2018 email message from Microsoft in his "Hamilton" file but did not look at the documents produced by Microsoft because he had been terminated.   Chasan's decision not to look at the documents had nothing to do with his non-disabling fractured rib, which was healing as expected.

237.   Pierce's seeking a discovery extension only two weeks before the cut-off of fact discovery was premised on his false statement that Chasan was unable to work on discovery due to his rib fracture, and on an implicit argument that Chasan had been negligent in not pursuing discovery relevant to the defendants' supposed fraud, intentional concealment, and negligent misrepresentation, and thus Hamilton was prejudiced by Chasan's

alleged negligence (in addition to the skiing injury), in the event Judge Brody did not grant the requested, belated extension of discovery deadlines.

238.   Pierce's motivation in falsely representing that Chasan was physically disabled from pursuing discovery for 70 days was to cover his own failure to pursue discovery promptly upon Chasan's termination by Hamilton, while he searched for a new local counsel, moved for his own *pro hac vice* admission, and arranged the transfer of Chasan's "Hamilton" file.

239.  Had Pierce wanted to work with Chasan, as Chasan had invited in March 2018, his *pro hac vice* application could have been filed by Chasan before the end of March 2018.

240.   Any prejudice to Hamilton due to Pierce's weeks-later retention of Stradley Ronon, and his weeks-later filing for *pro hac vice* admission, and his weeks-later acquisition of Hamilton's file transferred by Chasan, was due solely to litigation choices made by Pierce.

241.  On June 28, 2018, Judge Brody entered an Order granting in part Hamilton's motion for an extension of discovery deadlines (ECF 65), and on July 2, 2018, she entered an amended scheduling order (ECF 66) extending the deadline for fact discovery to September 28, 2018.

242.  Thereafter PBBPH Law assigned numerous additional attorneys to conduct depositions of Lester Speight and past and present employees of Epic Games and Microsoft, and to aggressively pursue additional document discovery from the Defendants.  Newly hired PBBPH Law attorneys Vanessa

Biondo, Jonathan Sorkowitz, and Yi Wen Wu, applied for *pro hac vice*

admission on 8/1/2018 (ECF 67, ECF, 68, ECF 69), and were duly admitted.

Another new PBBPH Law attorney, Claiborne Hane, applied on 8/31/2018

(ECF 76) and was duly admitted.   Upon information and belief, the average

annual salary of Biondo, Sorkowitz, Wen Wu and Hane was over $200,000.

243.  In the continuing email settlement negotiations between Pierce

and Chasan, Pierce sent Chasan two letters dated July 25, 2018 on PBBPH

Law letterhead (**Exh. J** and **Exh. K**) via email.  The first letter (**Exh. J**) was

an amplification of the malpractice action threat, and stated in part:

> We are hereby advising you, separate and apart from any
> settlement discussions, that prior to your filing any complaint
> against our law firm, you owe a duty to inform your malpractice
> carrier that upon your filing a complaint against our law firm, our
> law firm has communicated to you that it will be filing cross-
> complaint(s) against you and your law firm on behalf of our law
> firm and/or on behalf of our client, whereby we will be making
> eight-figure damage requests.
>
> Furthermore, if, as we suspect, we are successful in defeating
> the causes of action in your complaint, we also anticipate filing a
> malicious prosecution suit against you, also with eight-figure
> damages. This malicious prosecution suit would be based on
> your filing a retaliatory, malicious, harassing, frivolous, and
> meritless complaint. We have previously informed you why we
> believe that the damages will be in the eight figures.

244.  The second July 25, 2018 letter (**Exh. K**) was a further

discussion of settlement proposals.  Pierce correctly surmised in this letter

that Chasan's contemplated lawsuit would be based on wrongful interference

with contractual relations, and it stated in part:

> Here, whatever was communicated between Skip and our law

firm is entirely privileged and confidential. Furthermore, there is no evidence whatsoever that any information that our law firm provided to Skip was not honest attorney-client privileged advice within the scope of an attorney-client relationship or within the scope of a prospective attorney-client relationship.

\* \* \* \*

We also believe that any lawsuit that you file will cause our law firm and Skip to suffer from an inability to obtain an optimal settlement in Skip's case. Your lawsuit would be found by the defendants in the Gears of War case, which undoubtedly would severely affect a potential settlement at an optimal settlement amount. Our inability to achieve a settlement at an optimal settlement amount will be attributed to your actions, with estimated eight-figure damages.

According to this letter (**Exh. K**), because of the assertion of attorney-client privilege, Chasan would have no opportunity to speak with Hamilton directly in the settlement negotiations.  Also, Pierce made clear that his interest in settlement negotiations was to avoid a collateral suit that might prejudice the presentation of Hamilton's "right of publicity" case against Epic Games, Microsoft and Lester Speight.  Pierce's letter offered a sum of money and said Hamilton would have to approve it.

245.  Following receipt of Pierce's two letters dated July 25, 2018, Chasan continued to refrain from filing his contemplated lawsuit, also out of concern to avoid prejudice to Hamilton's "right-of-publicity" lawsuit, and Chasan also continued with settlement negotiations with Pierce via email.

246.  In a brief in support of a discovery motion in Hamilton's case, filed on 8/31/2018, Pierce and PBBPH Law asserted "the damages … are therefore in the nine figures," especially in view of sales of the GOW video

games with bundled products.    (ECF 77-16 at 15).

247.  On September 15, 2018, Chasan and BJC Law reached

agreement on settlement terms with PBBPH Law, as explained in the next

two paragraphs.

248.  On September 10, 2018, Pierce, via email, communicated to

Chasan two "final offers" as follows, both conditioned upon getting Lenwood

"Skip" Hamilton's approval:

> My first offer is the full $160,000 — the same amount that you
> were willing to accept from a $400,000 [hypothetical] settlement
> in March of this year [of Hamilton's right of publicity case]. There
> would be no further payment to you of any kind for any reason
> from our law firm or from Skip, regardless of the outcome of the
> case.
>
> My second offer is $110,000 upfront with no 4% contingency
> fee, but with the balance of the $319,000 paid to you exclusively
> from the first net proceeds recovered from all defendants [in
> Hamilton's right of publicity case], whereby "net proceeds"
> means gross recovery minus all of our law firm's costs and
> expenses (but not including legal fees incurred by our law firm's
> attorneys) in prosecuting the case.

The bracketed text statements in the above quotation have been inserted to

provide context to Pierce's two offers.

249.  On September 15, 2018, Chasan replied to Pierce's 9/10/2018

email, stating as follows:

> We have a settlement.  I am accepting your first offer
> listed below, i.e. the full $160,000 with no further payment by
> you or your law firm or by Skip Hamilton, regardless of the
> outcome of the case.
>
>  We should be able to accomplish this speedily.  The
> Mutual Release is simple in concept:  In consideration of

payment of $160,000, Law Offices of Bruce J. Chasan, LLC and Bruce J. Chasan release all claims against John Pierce, the Pierce Bainbridge law firm, and Lenwood Hamilton.   Also, you and Pierce Bainbridge and Lenwood Hamilton release all claims against Law Offices of Bruce J. Chasan, LLC and Bruce J. Chasan, Esq.

Skip should readily accept this, as it reduces his *quantum meruit* liability by at least half.

Do you want to draft the mutual releases?   I believe this would be a relatively short document, just a couple of pages. No claims are reserved.  I expect we can get it done within a week, and payment can be made promptly.  Please advise.

Good luck with the case.

250.  Pierce replied on 9/15/2018 to Chasan's 9/15/2018 email, and copied his partners Jim Bainbridge and Carolynn Beck, stating:

Thanks Bruce. I am swamped with travel next 10 days or so. Carolynn/Jim, please work with Bruce to wrap this up swiftly.

251.  Although Pierce's email of 9/10/2018 did not specifically mention mutual releases, they were surely contemplated because: (a) Chasan and BJC would be surrendering any further claims to half of the attorney's fees listed in the invoices to Hamilton from BJC Law, and would therefore release Hamilton, PBBPH Law and Pierce from any further monetary liability; (b) Pierce himself had mentioned "mutual releases" as early as his 5/1/2018 email to Chasan (*see ante*, ¶ 224); (c) in view of the threats by Pierce against Chasan and BJC Law for malpractice and countersuits, Chasan needed releases from Hamilton, PBBPH Law, and Pierce; (d) Pierce's email to Beck and Bainbridge on 9/15/2018 told them to "work with Bruce to wrap

this up swiftly;" and (e) mutual releases would assure that there would be no further litigation between the disputants.

252.  Chasan did not hear from Bainbridge or Beck right away, so on 9/20/2018, he drafted a document entitled "Settlement Agreement and Mutual Release" (a true copy of which is attached as **Exh. L**), and emailed it to Pierce and also Bainbridge and Beck.

253.  The draft "Settlement Agreement and Mutual Release" document (**Exh. L**) included standard terms typically found in nearly all settlement agreements, including, *inter alia*: no admission of liability; non-disparagement; signatures acceptable in counterparts; no modification unless in writing by all parties; all parties had advice of counsel; severability of any invalid or unenforceable term; an integration clause; and a statement that the signatories intend to be legally bound.  These standard terms have never been in dispute.

254.  Later, on 9/20/2018, Bainbridge, after review, emailed Chasan (with copies to Pierce and Beck), with the following initial comments:

> In general it looks good, but there are a few points of clarification that will be needed.  For example, on page 4, paragraph 1, I suggest that it read something like the following to provide the normal protections that are afforded in a settlement agreement that contains mutual releases:

> 1.     **Payment**.   Lenwood Hamilton and Pierce Bainbridge Beck Price & Hecht, LLP, or either of them, singly or in combination, shall pay The Law Offices of Bruce J. Chasan, LLC the sum of One Hundred Sixty Thousand Dollars ($160,000.00) in full satisfaction of any and all claims of any nature against Lenwood Hamilton, Pierce Bainbridge Beck Price & Hecht, LLP and any of

> its employees, attorneys, Associates, Co-Counsel, Partners,
> including its Managing Partner, John M. Pierce, and any of its
> accountants, bookkeepers or independent contractors, that could
> be asserted by The Law Offices of Bruce J. Chasan, LLC and
> Bruce J. Chasan, Esq. against any of them, whether or not any
> such claims arise out of Attorney Chasan's representation of
> Hamilton in the case of *Lenwood Hamilton v. Lester Speight, et
> al.*, Case Number 2017-cv-0169-AB filed in the U.S. District
> Court for the Eastern District of Pennsylvania.

Notably, Bainbridge's 9/20/2018 email also mentioned "mutual releases."

255.  On 9/22/2018, Chasan emailed a message to Bainbridge, Pierce and Beck stating that he was "okay" with Bainbridge's modification of paragraph 1 (**Payment**).

256.  On September 25, 2018, Judge Brody held a hearing on Hamilton's discovery motion to obtain an extensive review of Microsoft's and Epic Games' electronic files, which the defendants were resisting on the basis of cost and alleged lack of good cause.  Vanessa Biondo, Esq. was the principal spokesperson from PBBPH Law on behalf of Hamilton.  During the arguments, counsel commented on the results of about 10 depositions, and Judge Brody remarked to Biondo, "I haven't seen anything that says to me you have a scintilla of a case.  That's the problem."  Judge Brody then said she would not order the full extent of what Biondo requested and would not extend the discovery deadline beyond October 5, 2018.

257.  More than three weeks passed from Bainbridge's 9/20/2018 email with a proposed modification to the draft Settlement Agreement and Mutual Release (**Exh. L**) without any further comments from Bainbridge,

Pierce or Beck.  So, on 10/17/2018, Chasan sent an email to Pierce,

Bainbridge and Beck, stating:

> I have taken the liberty of revising the Settlement Agreement and Mutual Release by substituting the paragraph 1 that Jim drafted on September 20 for the original text I had for paragraph 1. So here is the revision.  The only change is the substitution of paragraph 1 with Jim's text.

> Not having heard anything else, I assume that you, Jim and Carolynn have no more changes.   Hence, also attached is a PDF of the Settlement Agreement and Mutual Release which I have signed today for myself and for my LLC before a notary.

> The only thing left is for you to sign for yourself and the firm, and for Skip to sign, get it notarized, and make payment of the funds within 14 days from today, i.e., by October 31, 2018.

258.  A true copy of the revised draft Settlement Agreement and

Mutual Release that Chasan signed on 10/17/2018, and sent to Pierce,

Bainbridge and Beck, is attached as **Exh. M**.

259.  On October 25, 2018 (which was after the close of fact discovery

in Hamilton's "right of publicity" case), Pierce, Beck, Price and Hecht filed a

Motion for Leave to File [Hamilton's] Third Amended Complaint (ECF 95) and

included a Memorandum of Law (ECF 95-1) and Affidavit by Pierce (ECF 95-

2) with a mark-up of Hamilton's First Amended Complaint that was proposed

as the Third Amended Complaint.   The mark-up deleted the Lanham Act

counts and proposed the addition of a new Count for "Intentional Non-

Disclosure."  The proposed Third Amended Complaint also included language

regarding Microsoft's sale of GOW games bundled with Xbox One consoles,

as had been alleged in the SAC drafted by Chasan.

260.    The proposed new Count for "Intentional Non-Disclosure" was akin to the cause of action for "intentional concealment" that Chasan had allegedly negligently failed to plead, as outlined in Pierce's May 21, 2018 email to Chasan ("failure to bring the critical causes of action for fraud, intentional concealment, and negligent misrepresentation"), *ante at* ¶ 228. The proposed Third Amended Complaint did not include counts for "fraud" or "negligent misrepresentation," presumably because the discovery conducted by PBBPH Law did not develop evidence to support such claims.

261.    On October 30, 2018, in exchanging emails with Chasan about mutual releases regarding payment by PBBPH Law of $160,000 to BJC Law, to settle Chasan's claims for attorney's fees, Bainbridge proposed that Chasan kickback $30,000 to Hamilton to make the deal more palatable to Hamilton, and to secure Hamilton's signature on a mutual release. Bainbridge's email stated in part: "I am attaching a draft of the final copy of the Settlement Agreement that John [Pierce] has given the green light on for execution by Skip, him and you.  If you have any changes on this, it will require going back to John and Skip."   This unsigned Settlement Agreement forwarded by Bainbridge is attached as **Exh. N**.

262.  Chasan sent a reply email to Bainbridge on 10/30/2018 stating that the unsigned Settlement Agreement that Bainbridge had sent (**Exh. N**) included material modifications that Chasan could not accept.  In particular, it was no longer a "mutual release" because, as written by PBBPH LAW

(especially the Title and paragraph 4), Chasan and BJC Law were releasing Pierce, PBBPH Law, and Hamilton, and Pierce and PBBPH Law were releasing Chasan and BJC Law, but Hamilton was not releasing Chasan or BJC Law.

263.  Chasan's 10/30/2018 email to Bainbridge also stated that changes to paragraph 5 (non-disparagement) and paragraph 7 (warranties) in the proposed revised Settlement Agreement (**Exh. N**) had removed Hamilton from the non-disparagement and warranties obligations, and these modifications also were not acceptable.

264.  Chasan's 10/30/2018 email to Bainbridge also objected to the modification to paragraph 14 of the proposed revised Settlement Agreement (**Exh. N**) pertaining to Governing Law, Jurisdiction and Venue, because, as revised, it would require Chasan and BJC Law to sue in California to enforce the settlement in the event of non-payment of the $160,000.00 consideration.

265.  Based on Pierce's previous emails, Chasan had understood that Hamilton believed he had potential claims against Chasan and BJC Law for professional malpractice and/or breach of fiduciary duty.  In view of the document sent by Bainbridge on 10/30/2018 (**Exh. N**), it appeared Hamilton was not willing to release his potential malpractice claims.  But Chasan had not expected that Hamilton would balk at signing a release.

266.  Chasan viewed the draft sent by Bainbridge on 10/30/2018 (**Exh. N**) as an attempt to sabotage the settlement proposed and accepted

on September 10 and 15, 2018, by inserting extra terms that Pierce, PBBPH

Law, and Bainbridge likely would believe were unacceptable to Chasan.

267.  On 10/30/2018, Bainbridge emailed a reply to Chasan's

10/30/2018 email stating, *inter alia*, that (1) PBBPH Law could make

provision for Chasan and BJC Law to sue in Pennsylvania if the $160,000.00

consideration was not paid; (2) he would endeavor to modify the terms

regarding non-disparagement and warranties to be more acceptable to

Chasan and BJC Law; and (3) despite Hamilton's unwillingness to release

malpractice claims against Chasan and BJC Law, "I am attempting to move

this along so that we do not get hung up on what you claim is a 'nonsensical'

contingency [*i.e.*, Hamilton's threatened malpractice case]."

268.  Chasan regarded the $30,000 kickback suggestion (*ante* ¶ 261)

as meritless and ridiculous, as Chasan did not consider that Hamilton had

any viable claim for malpractice against him.  Nevertheless, in an effort to

move the matter to a conclusion, on November 2, 2018, Chasan emailed to

Bainbridge that he was willing to pay Hamilton a $10,000 kickback just to

get it done, and asked Bainbridge to propose that to Hamilton.

269.  On 11/8/2018, Bainbridge emailed to Chasan a proposed revised

"Settlement Agreement and Mutual Releases" document which included,

*inter alia*, changes to paragraph 14 to permit Chasan and BJC law to sue in

Philadelphia if the $160,000.00 consideration was not paid as promised.

Pertinent text from pp. 7-8 of this proposed revised draft agreement,

including paragraph 14, are excerpted and attached as **Exh. O**.  In other respects, this revised draft was still in flux in that it was uncertain whether changes pertaining to a release by Hamilton could or would be finalized.

270.  On November 15, 2018, Pierce emailed Chasan advising that the settlement negotiations had failed, seemingly confirming that Hamilton supposedly refused to sign a mutual release.  He wrote Bainbridge would follow up with more details.   He added he might see Chasan again in court if PBBPH Law needed to sue Chasan for "repeated breaches of fiduciary duty" to Hamilton.  He copied Bainbridge and other PBBPH Law partners.

271.  Later in the afternoon on Nov. 15, 2018, Bainbridge sent Chasan a lengthy email which, for the first time, elaborated on the "breach of fiduciary duty" allegation.  Bainbridge wrote:  "Pierce Bainbridge believes that you breached your fiduciary duties to Skip when you sent him your March 12, 2018, letter that clearly attempted to unduly pressure Skip into either accepting your general thinking about a framework for settlement discussions or accepting that you would no longer be putting your energies into Skip's case and that you might even write to Judge Brody seeking leave to withdraw, even though you had signed an engagement agreement with Skip whereby you accepted to diligently represent Skip to the end of the case on a contingency-fee basis."

272.   Bainbridge's analysis was flawed by deliberate omission of pertinent facts including:  (a) Chasan was not contractually obligated to fund

Hamilton's case – it was Hamilton's responsibility; (b) as of March 12, 2018, diligent efforts by Chasan to find a third party litigation funder had failed; (c) without funding, there was no way to hire experts to support Hamilton's case or even engage in significant fact discovery;  (d) there was a fact discovery deadline of June 29, 2018, less than four months away, and Microsoft and Epic Games had signaled they would oppose further extensions; (e) Chasan believed that the settlement overture by Microsoft made sense to pursue and was in Hamilton's best interests (not just his own0, and any suggestion of conflict of interest was ill-founded because Chasan was not pursuing the agenda of some other client that had a conflict with Hamilton, nor any remuneration that was exclusively his own without regard of a financial settlement for Hamilton; (f) the Pennsylvania Rules of Professional Conduct permit an attorney to seek leave to withdraw if there is a "fundamental disagreement" with the client; (g) Chasan never presented Microsoft and its co-defendants with a settlement demand that Hamilton did not authorize; (h) Chasan did in fact continue to pursue third party funding with Legalist, Inc. on Hamilton's behalf; and (i) Hamilton suffered no injury from the alleged "breach of fiduciary duty."

273.  Based on the 11/15/2018 emails received from Pierce and Bainbridge, the two of them were co-architects of the "breach of fiduciary duty" allegation, and they used it to threaten Chasan with an eight-figure malpractice case, and it also served as a pretext for backing out of the

$160,000 settlement that Pierce himself had proposed in September 2018.

274.   Pierce's threat to sue Chasan on behalf of Hamilton for "breach of fiduciary duty" was baseless in Chasan's view because: (a) Chasan's efforts with Legalist, Inc. and Pierce in fact resulted in getting Hamilton funding for his case, which Hamilton needed and wanted; (b) after Chasan was terminated, the outcome of Hamilton's "right of publicity" case was entirely within the handling of Pierce and PBBPH Law; and (c) in view of the foregoing, Hamilton had no provable damages to assert against Chasan, assuming he could allege "breach of fiduciary duty."

275.   On 11/16/2018, Chasan sent Bainbridge a memo and a mark-up of the Settlement Agreement that Bainbridge had sent on 10/30/2018 (**Exh. N**).   This mark-up is attached as **Exh. P**.   In this proposed revised Settlement Agreement (**Exh. P**), Chasan and BJC Law would accede to Hamilton's reported insistence on not signing a release, and simply dealt with it by removing Hamilton as a signatory to the Settlement Agreement. As such, Hamilton would still receive a release from Chasan and BJC Law, as a third-party beneficiary, without having to give a release of his own, and Chasan and BJC Law would take the risk of any malpractice (or breach of fiduciary duty) case that Hamilton might later assert against them.

276.   As explained in the memo that Chasan sent Bainbridge on 11/16/2018, Hamilton was not an essential or necessary party to the

proposed Settlement Agreement (**Exh. P**), as he was not surrendering any

rights:

> For reasons which I will elaborate on below, I am proposing a modification of the "Settlement Agreement" you sent me on October 30, 2018, with material inserted from the proposed agreement that you sent on November 8, 2018.  See attached PDF of your October 30 draft with my handwritten notations [excerpted in **Exh. [P]**].  Here are the essential particulars:

> 1.     In exchange for the $160,000 payment, I release Skip and the Pierce Bainbridge Parties.  (Since the only claim I have against Skip is for payment of legal fees, he is released from any and all claims for fees above the $160,000, which PBBPH Law would pay.)

> 2.     Pierce Bainbridge Parties release the Chasan Parties as you proposed.

> 3.     Skip does not release anything or anyone.  (He retains the theoretical right to sue me for malpractice.  I consider any such claims meritless and frivolous.)

> 4.     Skip is not a party to the Settlement Agreement.  (He doesn't have to be; he's not a party in my contemplated lawsuit.  But he is a third-party beneficiary of the release that I would give.)

> 5.     The provision on Jurisdiction and Venue incorporates the term that the Chasan Parties can sue the Pierce Bainbridge Parties in PA if the $160,000 is not paid as promised, as you proposed in your November 8, 2018 draft.

> I have concluded that the possibility of a malpractice case against me brought by Skip is extremely remote……….

> [T]he revised settlement proposal I am making today. . . . would resolve our dispute entirely without prejudicing Skip in any way, shape or form.  He gets a clear benefit.  He does not need to be a signatory.   He does not give up any rights or claims.

277.  Chasan also explained in detail in the 11/16/2018 memo to Bainbridge that he was not impressed with the allegation of "breach of fiduciary duty," and considered it baseless.

278.  Pierce and PBBPH Law did not accept the proposed amended Settlement Agreement that Chasan sent on 11/16/2018 (**Exh. P**), despite that it is a non-material revision of what Attorney Bainbridge had previously drafted on behalf of PBBPH Law.  Bainbridge sent Chasan an email on 11/21/2018 suggesting that the parties shelve further settlement discussions while awaiting the outcome of Hamilton's "right of publicity" case; as such, this was contrary to the proposal in Pierce's email of 9/10/2018 ("regardless of the outcome of the case") and hinted that PBBPH Law had misgivings about the deal Pierce had made.

## VI. UNSUCCESSFUL LAWSUIT TO ENFORCE THE SETTLEMENT

279.  On 12/14/2018, Chasan and BJC Law filed suit against PBBPH Law and Pierce, in an action styled *Law Offices of Bruce J. Chasan, LLC, et al. v. Pierce Bainbridge Beck Price & Hecht, LLP, et al.*, No. 18-cv-5399-AB, (E.D. Pa.).

280.  Chasan and BJC Law elected to frame the lawsuit as a breach of contract matter regarding the 9/15/2018 settlement and requested specific performance of the contract.  Chasan and BJC Law elected that course instead of a tort action for wrongful interference with contractual relations in the belief that an action to enforce the settlement would be quicker and less

complicated than a case for tortious interference with contractual relations, and also less likely to prejudice Hamilton's "right of publicity" case.

281.  In seeking enforcement of the settlement, Chasan and BJC Law contended that the settlement was complete as of 9/15/2018 based on Pierce's 9/10/2018 offer and Chasan's 9/15/2018 acceptance, and that Hamilton's consent was not material to the agreement because he was a third-party beneficiary; thus, Chasan and BJC Law contended and argued Hamilton did not need to approve the settlement or sign a release.

282.  Chasan and BJC Law served written discovery requests to PBBPH Law seeking information about Hamilton, and also noticed a deposition of Hamilton.  PBBPH Law and Pierce declined to provide meaningful discovery responses and refused to cooperate in arranging Hamilton's deposition.

283.  Chasan and BJC Law filed a motion to compel discovery, including the taking of a deposition of Hamilton, and Pierce and PBBPH Law opposed, basing their opposition in part on the attorney client privilege.

284.  PBBPH Law filed a motion to dismiss the settlement enforcement action on grounds that the complaint did not allege an enforceable contract. They also contended that Hamilton's agreement was a material term of the alleged settlement agreement, and Hamilton had not consented.

285.  On 5/2/2019, Hon. Anita B. Brody dismissed the Complaint on grounds that it failed to allege an enforceable contract.  *Law Offices of Bruce J. Chasan, LLC, et al. v. Pierce Bainbridge Beck Price & Hecht, LLP, et al.*,

No. 18-cv-5399-AB, 2019 WL 1957950 (E.D. Pa. May 2, 2019). In her opinion, she stated Hamilton's consent was a material term, even though Plaintiffs had alleged that it was not.

286. In footnote 2 of her 5/2/2019 opinion, Judge Brody wrote: "I do not address the merits of Chasan's claims for tortious interference with contractual relations and unjust enrichment that Chasan mentions in his briefing. *See* Pl.'s Opp. at 4 n.1. If Chasan wishes to pursue those tort claims, he must move for leave to amend his Complaint or file a new lawsuit."

287. Also, on 5/2/2019, Judge Brody entered an Order denying the motions of Chasan and BJC Law to compel discovery as moot, in light of her decision and order dismissing the lawsuit.

288. Thus, Chasan and BJC law were unable to get a deposition of Hamilton before the case was dismissed.

289. Chasan and BJC Law elected to appeal Judge Brody's dismissal order to the Court of Appeals, with the assurance, based on n.2 of her opinion, that the if the appeal did not succeed, they still had the option of filing another lawsuit alleging tortious interference with contractual relations.

290. Eventually the Court of Appeals affirmed the dismissal order. *Law Offices of Bruce J. Chasan, LLC, et al. v. Pierce Bainbridge Beck Price & Hecht, LLP, et al.*, No. 19-2261, 792 F. App'x 195 (3d Cir. Nov. 26, 2019).

## VII.  CONTEMPORARY HAPPENINGS IN HAMILTON'S LAWSUIT.

291.  On 12/18/2018, Judge Brody heard oral argument in open court on Hamilton's motion for leave to file a Third Amended Complaint.  David Hecht of PBBPH Law argued the motion for Hamilton.  Chasan attended the arguments.  Judge Brody unexpectedly requested or directed Hecht to speak with Chasan about resolving the settlement enforcement action filed by BJC Law and Chasan on December 14, 2018.

292.  Hecht had not been a participant in the prior settlement negotiations between Chasan and Pierce and Bainbridge, and Chasan was unaware whether Hecht had any settlement authority. During their conversation, Hecht threatened to tarnish Chasan by exposing Chasan's March 12, 2018 letter (**Exh. E**) which he dubbed the "pig letter."  Hecht and Chasan did not resolve anything.

293.  On 1/10/2019, Judge Brody entered an Order and Memorandum Opinion holding that Hamilton was granted leave to drop the Lanham Act count in his SAC, but denying leave to amend to add a count for "Intentional Non-Disclosure," as Hamilton had not shown there was evidence to meet all the elements of such a claim.  (ECF 105, 106).

294.  On 2/1/2019, the Defendants in Hamilton's lawsuit filed a Motion for Summary Judgment.  (ECF 109, 110, 111).  One of the attachments was the transcript of the September 21, 2018 deposition of Hamilton (ECF 110-6).  Pierce had defended Hamilton's deposition.

295.   Disclosures in Hamilton's deposition included that Pierce was paying him $1000 periodically to serve as his "driver" (pp. 38, 42, 257-258). Also, he didn't have any money and had started a GoFundMe page when he was looking for an attorney to take his case (pp. 259, 314).  It took him nearly two years to find an attorney and he wouldn't have had anything filed without Mr. Chasan (pp. 143-144, 253-254).  Chasan introduced him to Pierce and he moved to Los Angeles after retaining Pierce (pp. 38-42, 257-258).   He did not know if Chasan still had a continuing financial interest in his case and said they should ask his attorney, Pierce (p. 255).

296.   PBBPH Law filed Hamilton's opposition to the summary judgment motion.   One of the items submitted was a Declaration by Dr. Ray Abdallah (ECF 113-4), which stated, *inter alia*: "8.  I believe Cole's voice sounds exactly like Hamilton's voice."   Also, approximately 16 fact and expert depositions were submitted by the parties in support of or in opposition to the summary judgment motion, and from the ones not filed under seal, there was considerable travel involved because the venues for the depositions included diverse cities such as Philadelphia, Detroit, Washington, D.C., Raleigh NC, Bellevue, WA, and Los Angeles.

297.   Judge Brody heard oral arguments on Sept. 25, 2019 on the Defendants' summary judgment motion.  Hecht argued for Hamilton.

298.   Judge Brody entered an Order and Memorandum Opinion on Sept. 26, 2019 granting the Defendants' summary judgment motion on First

Amendment grounds and dismissing Hamilton's case.  (ECF 123, 124).  Her
Opinion quoted admissions made by Hamilton in his deposition.

299.   The filings in support of and in opposition to the Speight-Epic
Games-Microsoft motion for summary judgment included excerpts of
depositions of at least nine fact witnesses, and at least three expert
witnesses.  The expert witnesses retained by PBBPH Law to support
Hamilton's case included Dr. Benham Bavarian, M.D. (facial recognition
expert), Edward Primeau (voice identification expert), and Barbara Carole
Luna (damages expert).  PBBPH Law did not use Hamilton's original self-
selected voice identification expert, Tom Owen, or the damages expert
recommended by Chasan (Wes Anson of CONSOR).

300.   Hamilton filed a timely notice of appeal (ECF 128).

301.   Hamilton filed his appellate brief in the Court of Appeals on
February 20, 2020, represented by PBBPH Law.  Per the Certificate of
Compliance in his brief, the word count was 8755, considerably less than the
13,000 allowed by Federal Rule of Appellate Procedure 32(a)(7)(B).

302.   Hamilton did not appeal the denial of his motion for leave to
amend the SAC to add a count for "Intentional Non-Disclosure," as Judge
Brody had ruled on Jan. 10, 2019 (ECF 105, 106), even though he had
"space" in his brief in view of the applicable word limit.  As such, Hamilton
(and PBBPH Law) waived their ability to assert a claim for "Intentional Non-
Disclosure," which was the only remaining basis of Attorney Chasan's alleged

"malpractice" touted by Pierce in his May 21, 2018 email to Chasan (*see ante* at ¶ 228).

303.   However, Hamilton's appeal brief argued that Judge Brody erred in granting summary judgment on First Amendment grounds, and it relied on the same arguments crafted by Attorney Chasan in the Memorandum of Law filed by Chasan in Opposition to the Motion to Dismiss the SAC (ECF 36-1), including many of the same case authorities.

304.   Of particular interest is that Hamilton's appeal brief argued that Judge Brody erred because Hamilton's likeness was used by the defendants (especially Microsoft) for commercial purposes, such as promoting the bundled sale of Xbox One consoles, and the First Amendment does not protect exploitation of someone's likeness for commercial purposes.   This argument germinated out of allegations that Attorney Chasan (and Chasan alone) inserted into the SAC, and Chasan advocated in the brief opposing dismissal of the SAC (ECF 36-1).   For example, Hamilton's appeal brief relied heavily on the case of *Jordan v. Jewel Food Stores*, 743 F.3d 509 (7th Cir. 2014), which Chasan had cited in the brief opposing dismissal of the SAC.

305.   PBBPH Law and its partners appropriated Attorney Chasan's legal work on Hamilton's behalf, without having paid Chasan or BJC Law a single penny for Chasan's labors.

## VIII.  SECOND LAWSUIT, FOR TORTIOUS INTERFERENCE AND UNJUST ENRICHMENT.

306.  On March 9, 2020, while Hamilton's appeal was pending in the

Court of Appeals, Chasan and BJC Law filed a second lawsuit, that time alleging tortious interference with contractual relations and unjust enrichment. *Law Offices of Bruce J. Chasan, LLC and Bruce J. Chasan v. Pierce Bainbridge Beck Price & Hecht, LLP, John M. Pierce, James Bainbridge, Carolynn Beck, Maxim Price, David L. Hecht, and Pravati Capital LLC*, No. 20-cv-1338-AB (E.D. Pa.).  The case was assigned to Judge Brody.

307.  Chasan and BJC Law served written discovery to the defendants which sought, *inter alia*, information in their custody and control about Hamilton.

308.  Chasan and BJC Law filed an Amended Complaint on May 18, 2020.

309.  The Defendants filed motions to dismiss the Amended Complaint on May 29 and June 1, 2020.

310.  The PBBPH Law Defendants collectively filed a motion to stay discovery on June 5, 2020, while the motions to dismiss were pending.   In their brief in support of staying discovery, the PBBPH Law Defendants argued, *inter alia*, that the requested discovery impermissibly inquired into privileged topics.

311.  On June 26, 2020, the Parties filed a Joint Discovery Plan, in which the Defendants indicated their opposition to much of what Chasan and BJC Law sought (as nearly all of it related to Lenwood Hamilton), and also reiterated their position that discovery should be stayed.

312.  On July 1, 2020, Judge Brody held a telephone conference call in which she heard arguments on the motion to dismiss the amended complaint.  She took the matter under advisement, but also stated she would stay discovery pending her ruling on the motion to dismiss.

313.  On July 1, 2020, an Order by Judge Brody was entered staying discovery.

314.  During the time that the second lawsuit by Chasan and BJC Law was pending, on May 20, 2020, John Pierce and PBBPH Law filed a reply brief in the Court of Appeals in support of Hamilton's appeal to reverse the summary judgment that Judge Brody had entered against him.

315.  On September 17, 2020, the Court Appeals affirmed Judge Brody's decision dismissing Hamilton's SAC.  *Hamilton v. Speight*, No. 19-3495, 827 F. App'x 238 (3d Cir. Sept. 17, 2020).

316.  On January 15, 2021, Judge Brody rendered a decision and order dismissing the second lawsuit.  *Law Offices of Bruce J. Chasan, LLC v. Pierce Bainbridge Beck Price & Hecht, et al.*, No. 20-cv-1338-AB, 2021 WL 148406 (E.D. Pa. Jan. 15, 2021).  As to the tortious interference and unjust enrichment counts alleged against the PBBPH Law Defendants, Judge Brody held that those claims were barred by res judicata, notwithstanding her statement in n. 2 of her opinion in the first case that Chasan and BJC Law could file a new lawsuit.  *See ante*, ¶ 286; 2021 WL 148406 at *4-5.

### IX.  LENWOOD HAMILTON'S UNSOLICITED TELEPHONE CONTACTS TO CHASAN BEGINNING FEBRUARY 24, 2021.

317.   There was no contact from Hamilton to Plaintiffs from the time Hamilton discharged Plaintiffs on 3/28/2018 (with a missive dated 3/27/2018, **Exh. B**, *ante*) until Hamilton placed unsolicited telephone calls to Chasan's residence on 2/24/2021 (nearly 35 months later).

318.   On 2/24/2021, at 1:21 AM and 1:28 AM (whilst Chasan was asleep), Skip Hamilton unexpectedly left two voicemails on Chasan's residence landline as follows (phone numbers redacted):

Automated Voice:
[Voice message] received at 1:21 AM February 24 from 724-XXX-XXXX.

Hamilton:
Hey Bruce, this is Skip, Lenwood Hamilton. How you doing?  Hey listen, I want you to help me go after uh, after uh, the guy that you uh love. I want to know if you uh if you're up to the task.  Okay, give me a call back at this number when you get the message. Thanks a lot. Hope all is well with the family.

Automated Voice:
[Voice message received at] 1:28 AM February 24 from 724-XXX-XXXX.

Hamilton:
Oh, oh, Bruce. I just wanted to let you know, I didn't ask Ray for lunch yet. I haven't been back. [inaudible] I'm not in Pennsylvania. I'm still in L.A. Golly. But I know that you uh, that you like going after the bad guy, and uh, I want to know if you're interested in doing this thing. Uh, 69 million dollars this cat's sittin' on somewhere.  69 million, that's what he borrowed against my case. So, you said that it wasn't worth but a million, but I found out the hard way what it was worth. Uh, he did me dirty, but I got a lot of irons in the fire, you know what I'm saying? People underestimate big people like we don't think. (Laughs) [inaudible] You know what I mean, dog? But you know [inaudible 00:01:19].

Hey listen, give me call though, I'm serious, on a serious [inaudible 00:01:24]. Give me a call, and let's talk about this, because uh here's the other thing, it either be you or somebody else and I thought you or Don Lewis might want to go after this guy the right way.  Okay?  All right, talk to you later.  Give me a call back at this number, Bruce.  Even if you don't want to do it, give me a call back. Thank you.  Bye-bye.

*See* **Exh. Q** (transcript); for audio, play Track 1 of disk to be supplied (**Exh. Z**).   Chasan interpreted the reference to the "cat sitting on 69 million" as a

reference to Pierce.

319.  Chasan called Hamilton back on 2/24/2021 at about 2 PM Eastern Daylight Time.  The initial conversation was about three minutes. *See* **Exh. R** (transcript); for audio, play Track 2 of disk to be supplied (**Exh. Z**).  Chasan asked Hamilton's consent to record the call; Hamilton agreed. Chasan then stipulated the conversation would not be confidential, but Hamilton did not agree.  At that point, Chasan said they should terminate the call, think about it, and call back the next day.  Hamilton agreed.

320.   Chasan called Hamilton back on 2/25/2021 at about 2 PM EDT and left a voicemail.

321.   Hamilton returned the call about an hour later on 2/25/2021. *See* **Exh. S** (transcript); for audio, play Track 3 of disk to be supplied (**Exh. Z**).  Hamilton agreed to have the call recorded and asked if he could also record it, and Chasan said yes.   The connection was not the best and Chasan asked if he could call back in a few minutes.  Hamilton provided a call back number.

322.   Chasan called back a few minutes later and they had a recorded conversation of more than 42 minutes.  *See* **Exh. T** (transcript); for audio, play Track 4 of disk to be supplied (**Exh. Z**).[2]

---

[2]  The transcript and audio are complete except for a 90-second section that has been redacted.  The redacted portion consists of Hamilton's vociferous criticisms of Judge Brody regarding her First Amendment ruling dismissing his right-of publicity case.  No purpose would be served by including this

323.   At the beginning of the second Feb. 25 call (**Exh. T**), Chasan

inquired about the circumstances of his discharge by Hamilton in 2018, and

Hamilton responded that it was Pierce's idea and decision:

| | |
|---|---|
| 7 | MR. CHASAN: Okay. I can, I can |
| 8 | hear you better now. I don't know what that |
| 9 | last connection was. Okay.    So, uh, |
| 10 | all right, so, I'm recording you, you're |
| 11 | recording me and that's fine. And uh, uh -- |
| 12 | now, uh, be - before, we, we get into the |
| 13 | specifics of what you want me to do, uh, a |
| 14 | couple of things I need to explain to you, |
| 15 | that this, the whole thing here is a little |
| 16 | bit odd, uh because, as you know, three years |
| 17 | ago you discharged me.    And, uh, uh, then, uh, |
| 18 | I was negotiating with uh, uh, John |
| 19 | Pierce to uh, uh, get some compensation, which |
| 20 | I thought would come from the uh litigation |
| 21 | funder, and uh, in the uh negotiations -- |
| 22 | MR. HAMILTON: Let me stop you |
| 23 | right there. |
| 24 | MR. CHASAN: Yeah. |
| 25 | MR. HAMILTON: Okay. The |
| 1 | discharge, uh, actually I should've kept you |

segment.    However, there was nothing threatening in Hamilton's comments.
The entire transcript and audio can be provided under seal if needed.

2     on board.  You should've been with the team,

3     John asked me, do you want to let him go and

4     I said what do you think?    Do we need him on

5     the team?    And he said, w e l l  look, I fire

6     people all the time, so I have no problem with

7     that.   So, I said whatever you think is

8     better, you know. So, actually he took that

9     out of my hands.

10            MR. CHASAN: So - so − so -so,

11     in other words, he h e  suggested that uh, that uh,

12     you should, you should let me go, is that basically it?

13            MR. HAMILTON: It's just what I

14     said.

15            MR. CHASAN: Yeah.

16            MR. HAMILTON: I asked him,

17     what do you think?    And he said, well, I

18     fire people all the time.    I have no problem

19     with doing it. You know, it would have been

20     -- I think it would have been more

21     appropriate if we had a set down and had a

22     meeting and discuss whether or not to let

23     you go or t o  keep you on the team if you

24     wanted to be on the team.

See **Exh. T** at 1-2.

324.  Hamilton acknowledged that he signed the note discharging

Chasan, but it was drafted by the PBBPH Law firm.  See **Exh. T** at 3.

325.   Chasan inquired about the malpractice threat made by Pierce on behalf of Hamilton -- which Pierce represented Hamilton had authorized -- but Hamilton said he did not know anything about it:

23          MR. CHASAN: O k a y,  I, I, I  get

24     that, but but here's the thing,  u h ,  when, a fter

25     I was fired I was negotiating with John

26     Pierce to get some compensation which I

1      expected would come from his firm or from

2      litigation funder. And he sent me a uh, an

3      email uh, followed by a letter saying that

4      you had authorized a malpractice case

5      against me. Do you remember that?

6          MR. HAMILTON:  Malpractice

7      case against ( i n a u d i b l e ) ?  Do I have one?

8          MR. CHASAN:  Well (laughs),  u h  I --

9      he sent me, he sent me a letter saying that

10     Lenwood Hamilton had authorized an eight

11     figure malpractice case against me, that's

12     ten million dollars. Do we --

13          MR. HAMILTON:  A malpractice

See **Exh. T** at 4-5.

326.   During the conversation, Hamilton frequently reverted to the theme that Pierce mishandled his case and he wanted to enlist Chasan as counsel to go after Pierce for malpractice.  *E.g.*, see **Exh. T** at 8, lines 4-21.

327.   But Chasan had more inquiries about his 2018 settlement negotiations with Pierce and whether Hamilton needed to approve the settlement:

| 1 | MR. CHASAN: Okay. Well I, |
|---|---|
| 2 | Well I have to, I need to pursue a couple more |
| 3 | questions about it. U m ,  I had this long |
| 4 | negotiation with with Pierce uh, and, uh, h e - |
| 5 | MR.  HAMILTON: And Don, a n d |
| 6 | Don Lewis. (laughs) |
| 7 | MR. CHASAN:  Well, I,  I really |
| 8 | wasn't involved with Don Lewis.    Maybe |
| 9 | P i e r c e ,  m a y b e  Pier P i e r c e  has some |
| 10 | matters with Don Lewis, but I don't, I don't |
| 11 | have any with him.  But I had this |
| 12 | long negotiation with Pierce in the summer |
| 1 | of 2018, and he came up with a proposal that |
| 2 | they were going to pay me a 160,000 dollars |
| 3 | uh, u h ,  t o  u h , to settle my m y  claim, |
| 4 | for attorney's fees. And I was agreeable to |
| 5 | that and he, uh, put in a clause that you had |
| 6 | to approve it.  N o w  did he, did he run that |
| 7 | by you? |
| | MR. HAMILTON:  No. |

See **Exh. T** at 8 and 9.

328.   After more discourse by Hamilton about his grievances against Pierce, Chasan brought the conversation back to the subject of whether Hamilton needed to approve the 2018 settlement on Chasan's claim for attorney's fees:

8              MR. CHASAN: I don't think

9       you're ignorant, uh, uh, uh, uh, uh, Skip.  But

10      I need, I need to correct something that t h a t  you

11      just said.  Y o u ,  y ou have to understand the

12      timeline, I mean I know the timeline very

13      well, okay. So, s o  just listen to me for a

14      little bit, okay? In, in September of 2018,

15      Pierce proposed a settlement with me of a

16      160,000 dollars and that would be all I would

17      ever get and I was agreeable to that. And we

18      would give mutual releases. But he put in a

19      condition that you had to approve the

20      settlement. Now, y o u  are you saying that he

21      never told you about that?

22                   MR. HAMILTON: He never

23      brought that to my attention. He never

24      brought that to my attention.

25                   MR. CHASAN: He never brought

1       it to your attention?

2                    MR. HAMILTON: No.

See **Exh. T** at 14 and 15.

329.  Chasan then queried Hamilton about mutual releases related to

the settlement proposal:

6              MR. CHASAN: W e l l ,  Okay. Uh

7       now, uh, going back to the timeline I wanted

8          to tell you about. That, that agreement that I

9          had with, with Pierce was around September 15th of

10         2018. Okay. T h a t ' s, I know the date exactly. And,

11         and -- uh, and uh, what I did is I prepared mutual

12         releases and I sent a draft to Pierce and Jim

13         Bainbridge. Did they ever show you the mutual

14         release?

15                    MR. HAMILTON: No.

*See* **Exh. T** at 16.

330.  Then Chasan asked Hamilton if Pierce and/or PBBPH Law ever informed him of their proposal that Chasan kickback $30,000 to Hamilton from the $160,000 settlement:

16                    MR. CHASAN: No. Umm, the, then, uh

17         I didn't hear from them for several weeks,

18         about a month. And, uh, toward the end of

19         October, uh, I followed up with Jim, u h, J i m

20         Bainbridge, and I said, w e l l  what's going

21         on, and, uh, uh, Bainbridge e-mailed me back

22         and said, well, u h,  if we, uh, if we give

23         you the 160 thousand dollars, uh, maybe, uh,

24         uh it would be u h  acceptable to, to Skip, if

25         you gave him back 30,000 dollars.    Did they

26         ever tell you that?

93

1        MR.   HAMILTON:        No.

2        MR.   CHASAN: Never told you

3     that.

4        MR.   HAMILTON:  No.

*See* **Exh. T** at 16 and 17.

331.  Hamilton inquired of Chasan whether they would go after Pierce

for malpractice.  **Exh. T** at 17:9-12.   Chasan brought the conversation back

to the 2018 settlement negotiations and Pierce's malpractice threat to

Chasan:

18           MR. CHASAN: W e l l.  Pardon me.

1 9      O k a y .  P a r d o n   m e .  U h ,  t h e,  the  t h i n g

20     is, this is a very peculiar situation,

21     Skip, because I was discharged, I wasn't

22     paid. I had -- I thought I negotiated

23     a settlement. I was threatened with

24     malpractice. Now it didn't come from you

1     apparently, but it came from Pierce. But he

2     represented that it came from you. And that,

3     – and, and y o u  say it didn't happen.

4           MR. HAMILTON:  That's what I'm

5     saying.

*See* **Exh. T** at 17 and 18.

332.  Hamilton's main malpractice contention against Pierce was that

Pierce was abusing drugs, and had Pierce not been on drugs, he would have

handled Hamilton's case better and gotten satisfactory results.  *See*, *e.g.*, **Exh. T** at 27, lines 1-10.

333.  Hamilton said he had no problem with paying Chasan and getting Chasan paid.  *See* **Exh. T** at 27, line 23 to 28, line 2; 28:9-10.

334.  Chasan asked whether Hamilton had any contact with the litigation funder, Pravati Capital LLC:

| | |
|---|---|
| 17 | MR. CHASAN: B y the, by the |
| 18 | way, did, did Pierce or anybody ask you to speak |
| 19 | with somebody from Pravati, the, the company that |
| 20 | was, uh, the litigation funder? |
| 21 | MR. HAMILTON: The only time that |
| 22 | that I signed some papers from Pravati, u h, |
| 23 | for forty thousand dollars, that was it. |
| 24 | MR. CHASAN: Do, do you remember |
| 25 | what the forty thousand was for? |
| 26 | MR. HAMILTON: It was supposed |
| | to be for my living expenses in the case. |

*See* **Exh. T** at 33.

335.  Hamilton colorfully expressed gratitude that Chasan took his case:

| | |
|---|---|
| 5 | MR. CHASAN: Well, you  know |
| 6 | what, I'll, I'll, I'll c e r t a i n l y  give you one |
| 7 | thing, Skip, you're a very persistent man |
| 8 | (laughs) 'cause, you know, I wasn't the first |

9      lawyer you contacted. (laughs)

10                    MR. HAMILTON:  But you know

11     what, you're the first one, you the first one

12     that had the balls to do what you did.

              * * * * *

20     And so, what I'm saying to you is, you're

2 1    the only one who had the balls to take it,

22     I appreciate that and I hope that we can come to

23     some type of common medium that what we can do this

24     shit and get paid the money that's owed to you and

25     some of the money that's owed to me.

*See* **Exh. T** at 40.

336.  Hamilton reverted to his belief that Chasan had a right to be

paid:

10                    MR. CHASAN:  All right.

11     A l l   r i g h t .  Well, you know, u h ,  regardless of,

12     regardless of what you think about my bills, and uh,

13     uh, I did do a lot of work for you and I got past the

14     Motion to Dismiss and, uh, and, uh I'm certainly

15     owed something, uh.

16                    MR. HAMILTON:  Damn right you are.

17     MR. CHASAN: Yeah.

18                    M R .  H A M I L T O N :   You're damn

19      right you are. Yeah, you you I, I h o p e   y o u   r e c o r d i n g ,

20      yeah, You're entitled to your money.

*See* **Exh. T** at 44.

337.  Twice in the conversation, Hamilton mentioned he felt Pierce treated him like an idiomatic "mushroom," keeping him in the dark.  **Exh. T** at 11, line 14, and 26, line 25.

338.   After Chasan and Hamilton completed their conversation on 2/25/21, Hamilton called his chiropractor friend Dr. Ray Abdallah and told him about his conversation with Chasan. Hamilton mentioned his conversation with Dr. Abdallah in two voice mails he left for Chasan in the early evening, February 25:

> Automated Voice:
> [Voice Mail left] at 5:58 PM February 25 from 724-XXX-XXXX.
>
> Hamilton:
> Hey Bruce, I was just talking to Ray, told him of our conversations, and he actually (?) told me to tell you that I can send you a PDK file or P PDK, some type (?) of file that David Hecht and Pierce put against Don, Don Lewis for me to put in. You might want to look at that. So give me a call back. Tell me if you want me to send it to you later.
>
> Automated Voice:
> [Voice Mail left] at 6:13 PM February 25 from 805-XXX-XXXX.
>
> Hamilton:
>
> Okay, Bruce. This is my second time calling you. Uh, I was talking to Ray, and he told me to send you the PDK file. Whatever that is, that thing that uh, that Hecht and Pierce tried to put together, they put together for me to file with the ethics board, with the Bar Association against Don Lewis. And he, they lied all in that damn thing, because I, I was told do not lie for him and do not erase anything from that, just attach little stickers where I see there's untrue or false or whatever and say that.  So, give me a call back when you can. Thanks.

*See* **Exh. U** (transcripts); for audio, play Track 5 of disk to be supplied (**Exh. Z**).  Presumably the "PDK" file Hamilton mentioned is actually a "PDF" file.

339.  In the earlier conversation on February 25, Hamilton alluded to "paperwork" prepared by David Hecht and John Pierce that they wanted him to sign that included statements he knew were not true.  **Exh. T** at 33:1-14.

340.  On February 26, 2021, Hamilton forwarded an email chain to Chasan (**Exh. V**) which included email exchanges between Pierce, Hecht and Hamilton relating to the Bar Complaint against Don Lewis that Pierce and Hecht drafted for Hamilton to sign. The email chain begins on 8/23/2020 (by Pierce), and continues on 8/23/2020 (by Hecht), 8/23/2020 (by Hamilton), 8/24/2020 (by Hamilton), 8/25/2020 (by Hamilton), 8/30/2020 (by Hecht, attaching the draft Bar complaint), 9/2/2020 (by Hecht about filing the bar complaint), 9/9/2020 (by Hecht about filing the bar complaint), and 10/2/2020 (by Hamilton, forwarding a copy of the draft bar complaint to persons other than Hecht and Pierce).

341.  Chasan has separately obtained a copy of a Motion for Order Setting Aside Default Judgment that Hamilton signed on 2/26/2021 (**Exh. W**), seeking to avoid eviction from the Ventura County, California residence that John Pierce had rented for him in May 2018.[3]   In the narrative signed

---

[3] Hamilton and Pierce were sued on July 1, 2020 by the landlord in California for back rent and eviction from the residence Pierce had rented for Hamilton in 2018.  Based on the landlord's complaint, the lease agreement was dated April 30, 2018, and commencement of the lease began on May 4, 2018. PBBPH Law partners Pierce, Beck and Price appeared *pro hac vice* in

by Hamilton, he set forth a litany of grievances against Pierce.  But, in part, the narrative stated:

> This attorney John Pierce uprooted me from Norristown PA.  My case at the time he told me was worth in excess of a billion dollars.   The meeting that we had was at the Marriott in Conshohocken, PA he took me and my friend out to lunch and he told us then along with other people that were in my group what my case was worth he then had a meeting with her lawyer that I had to release they Mr. Bruce Chason who tried to or was dishonest.

In context this is a disclosure that Pierce defamed Chasan by asserting Chasan was dishonest, all with a goal of getting full control of Hamilton's lawsuit.

342.  On March 10, 2021, Chasan emailed a letter to Hamilton (**Exh. X**) stating that he was declining Hamilton's request to file a malpractice case against Pierce, but recommending that he consult with a California attorney to determine if he had any other claims he could assert against Pierce under California law.  Chasan did not give a definitive opinion that any other claims were viable.  Chasan's March 10 letter also stated that an attorney-client relationship had not been re-established, and that their recent conversations were non-confidential.

343.   On March 15, 2021, Hamilton left a voice mail for Chasan stating he had received Chasan's March 10 letter.  Later, but also on March 15, 2021, Hamilton forwarded the draft Bar complaint to Chasan, which Hecht and Pierce had prepared for Hamilton to submit.  While most of the

Hamilton's right of publicity case on April 26, 2018, just four days before Pierce signed the lease agreement.

draft Bar Complaint was not relevant to Plaintiffs' settlement enforcement action, there are segments which included information that Plaintiffs had sought in discovery but were precluded from obtaining when the Court dismissed Plaintiffs' case and dismissed Plaintiffs' discovery motion as moot (ECF-33, ECF-34, ECF-35).   Here below is one significant segment, citing communications from PBBPH Law to Pravati Capital LLC made in early April and early May 2018:

<u>Excerpt from the Bar Complaint</u>

\*\*\*\*\*\*\*\*\*\*\*\*

The following is a capture from the firm's March report to Pravati, provided to me [Hamilton] by counsel:

---

**New Cases:**

**Gears of War:** We have been retained on a 40% contingency in this unauthorized use of name or likeness case filed by <u>Lenwood</u> Hamilton aka Hard Rock or Skip Hamilton against Epic Games and Microsoft for misappropriating his likeness and voice for their famous and extremely profitable Gears of War Xbox video game. Although initially we were retained as co-counsel, the client has opted instead to retain us as his only counsel, and as such we are now looking for local counsel to assist us with appearances and filings in the case.  We are still in the process of getting up to speed on this exciting new matter, which was filed in the US District Court for the Eastern District of Pennsylvania.

---

I [Hamilton] was informed by Pierce Bainbridge that on May 6, 2018, firm partner Jim Bainbridge heavily edited the discussion of my case and included an aggressive damages analysis.  Although Mr. Bainbridge described that the prospective damages may be "up to $1 billion," as shown below, the summary made clear that such damages would be "attempt[ed]" through disgorgement of profits "primarily on the basis of fraud, intentional concealment, and negligent misrepresentation"—none of which were causes of action that had been pled thus far and would require leave of the court to include in an amended complaint. Adding those claims was not guaranteed since, as mentioned in the summary of the matter, "[d]iscovery cutoff [was] currently scheduled for mid-summer."  The following is a capture of the relevant portion of the firm's April report, which was communicated to Pravati in early May 2018:

**-  Continued on the Next Page** -

---

**Key New Contingency-Fee Cases, Mixed Contingency Fee and Hourly Cases, and Full Hourly Cases**

**Gears of War:** We have been retained on a 40% contingency in this unauthorized misappropriation of likeness case filed by Lenwood Hamilton aka Hard Rock or Skip Hamilton, a former Philadelphia Eagles football player, against Epic Games and Microsoft for misappropriating his likeness and voice for defendants' famous and extremely profitable Gears of War Xbox video game.  Although initially we were retained as co-counsel, the client has opted instead to retain us as his only counsel.  This matter was filed in the US District Court for the Eastern District of Pennsylvania.  The Gears of War Xbox video game and hardware sales are estimated at close to $1 billion.  We will attempt to disgorge the gross profits of Microsoft, Epic, and the other Defendants, or at least the net profits, primarily on the basis of fraud, intentional concealment, and negligent misrepresentation.

This case has prospective damages of up to $1 billion, with Defendants that are able to pay the full damage award.  Discovery cutoff is currently scheduled for mid-summer.  We will be filing a motion for leave to amend the complaint to add causes of action for fraud, intentional concealment, and negligent misrepresentation.  We will be requesting disgorgement of profits for unjust enrichment (within each of these new causes of action and in the prayer) because the Defendants are not entitled to prosper from their misappropriation (theft) of the likeness of the Plaintiff, including but not limited to his voice.  We have retained local counsel and have just substituted into this matter.

Prior counsel for our client has been demanding fees in the sum of over $300,000 in order to transfer the file, but we believe that we are close to resolving open issues with our client's prior counsel, whereby prior counsel would be entitled to receive first monies, from the client's portion of the recovery only, up to just over $300,000 from proceeds of any settlement or judgment that is received from the case.

---

344.   It should be noted that the representation in the final paragraph that "prior counsel . . . has been demanding fees in the sum of over $300,000 in order to transfer the file" is false.   Chasan simply requested reimbursement for his time for an estimated 8 hours of work in assembling

and making an inventory of the file for efficient transfer to the newly retained local counsel, and that was agreed to.

345.   In addition, also at odds with the final paragraph, Chasan did not agree to a proposal by Pierce that Plaintiffs wait until a recovery in Hamilton's case for payment of first monies of $300,000.  That was one of Pierce's early offers, but Chasan did not agree to it.

346.  In sum, as a result of Hamilton's telephone contacts to Chasan beginning February 24, 2021, the following facts are newly discovered evidence unveiling Pierce's falsehoods and establishing fraud:

(a)   The decision to fire Chasan was made by Pierce, not Hamilton.  At best, Hamilton simply went along with what Pierce wanted.

(b)   Ultimately, Hamilton expressed regret, stating he should have kept Chasan on the team.

(c)   PBBPH Law acknowledged to Pravati that at first they were retained as "co-counsel."

(d)   Pierce threatened Chasan with a malpractice action on Hamilton's behalf – while claiming that Hamilton authorized such an action – when in reality, Hamilton provided no such authorization.

(e)   Pierce's malpractice threat against Chasan was a manufactured sledgehammer threat to discourage Chasan from

seeking his attorney's fees.

(f)      Pierce and PBBPH Law never told Hamilton he was required to approve any settlement offered to Chasan and BJC Law.

(g)      Pierce and PBBPH Law never showed Hamilton any draft release in connection with the settlement being negotiated between Chasan and BJC Law, on the one hand, and between Pierce and PBBPH Law, on the other.

(h)      Hamilton had no problem with seeing that Chasan got paid.

(i)       Hamilton harbored no everlasting animus toward Chasan, as otherwise he would not have sought to enlist Chasan as counsel in a potential malpractice case against Pierce.

(j)      Attorney Bainbridge demanded a $30,000 kickback to Hamilton without authority from Hamilton and without Hamilton's knowledge, and without disclosure to Hamilton.

(k)      Pierce and Attorney Bainbridge were involved in a civil conspiracy to threaten Chasan with a malpractice action without authority from Hamilton.

(l)       Pravati was aware Chasan was asserting a claim for his attorney's fees as early as May 6, 2018.

(m)      Pravati provided living expenses to Hamilton to the tune of at least $40,000.

(n)     Pravati funded PBBPH Law after May 6, 2018 when discovery was ramping up in Hamilton's case, knowing that Chasan was asserting a claim for attorney's fees.

(o)     Hamilton has waived attorney-client privilege in connection with Hamilton's representation by Pierce and PBBPH Law.

(p)     The 2021 telephone conversations between Hamilton and Chasan were non-confidential, as there was no attorney-client relationship between them.

(q)     Hamilton additionally waived any argument for confidentiality by telling his friend Dr. Ray Abdallah about his conversations with Chasan.

 (r)     Much of what Hamilton complained to Chasan about Pierce was publicly reiterated in the Motion that Hamilton filed in Ventura County, California, seeking to set aside his eviction.   In that filing, Hamilton disclosed that Pierce defamed Chasan with a "dishonest" label, as part of his scheme to induce Hamilton to fire Chasan.

(s)     Hamilton forwarded the draft Bar Complaint to Chasan after receipt of Chasan's 3/10/2021 letter reminding Hamilton that an attorney-client relationship had not been re-established and their contacts in 2021 were non-confidential.

(t)     The above new information is supportive of the averments in Plaintiffs' Settlement Enforcement Complaint that Hamilton's

approval of a settlement between the Chasan Parties and the Pierce Bainbridge Parties was immaterial, and the insistence by PBBPH Law in the settlement negotiations on getting Hamilton's approval was nothing more than a pretext for PBBPH Law to back out of the settlement Pierce had proposed.

(u)     Hamilton's belief that he was kept in the dark and treated like a "mushroom" by Pierce is borne out by, inter alia, his disclosures that he did not authorize a malpractice action against Chasan and he was not informed of the particulars of the Pierce-Chasan settlement negotiations, including that Pierce stated he needed to approve it, that he was never shown a release prepared by Chasan, and he was never informed of Bainbridge's suggestion that Chasan kickback $30,000 to Hamilton from the $160,000 settlement.

## JURISDICTION AND VENUE

347.  Jurisdiction is based on 28 U.S.C. § 1332(a)(1) because all of the Plaintiffs are Pennsylvania citizens, and none of the Defendants are Pennsylvania citizens or residents, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

348.  The Court has personal jurisdiction over PBBPH Law and its partners John M. Pierce and James D. Bainbridge and others because they voluntarily came to the Eastern District of Pennsylvania to litigate Hamilton's

"right of publicity" case in this District, No. 17-cv-0169-AB.  Further, John M. Pierce came to Philadelphia to represent Hamilton in his deposition, and other PBBPH Lawyers came to Philadelphia in connection with court hearings on motions and/or conferences required by Judge Brody.

349.  Not only was Hamilton's "right-of-publicity" case being litigated in this district, but also John M. Pierce personally traveled to Philadelphia to meet with Chasan, and to Philadelphia and Conshohocken, PA to meet with Hamilton, and those above activities were in furtherance of the Defendants' fraudulent scheme.

350.  Integral to the fraudulent scheme was the sending of numerous emails and correspondences to Chasan whom the Defendants knew had offices in Philadelphia.

**COUNT I – EQUITABLE ACTION TO VACATE THE JUDGMENT IN No. 18-cv-5399 DUE TO FRAUD -- WHICH PLAINTIFFS WERE UNABLE TO DISCOVER DESPITE REASONABLE DILIGENCE – AGAINST JOHN M. PIERCE, JAMES D. BAINBRIDGE, PBBPH LAW, BAINBRIDGE LAW APC, PIERCE BAINBRIDGE P.C., JOHN PIERCE LAW, P.C., JOHN DOE ATTORNEYS 1-10 (*i.e.*, ATTORNEYS AT PBBPH LAW INVOLVED IN SCUTTLING THE SETTLEMENT), AND JOHN DOE ENTITIES 1-10 (AS ADDITIONAL SUCCESSORS IN INTEREST OR ASSIGNEES OF PBBPH LAW).**

351.  All averments in the foregoing paragraphs are realleged and incorporated herein by reference.

352.  The negligent and intentional fraudulent activities of John M. Pierce and James D. Bainbridge, and unknown others at PBBPH Law, comprised misleading Chasan, via email communications, with false threats

that Hamilton had authorized a malpractice action against Chasan, and false assertions that Hamilton had to approve the settlement and would not approve it, when they never even discussed it with Hamilton and never sought his consent and never presented him with a draft of a release, and never communicated to Chasan that Hamilton was not opposed to the settlement.

353.   John M. Pierce and James D. Bainbridge, and unknown others at PBBPH Law, intended to induce Chasan to rely on their false statements that Hamilton had authorized a malpractice action against Chasan, and that Hamilton would not approve the settlement.

354.   The conduct of Pierce, Bainbridge and PBBPH Law comprised a scheme or artifice calculated to deceive persons of ordinary comprehension.

355.   Chasan and BJC Law justifiably relied on the false statements of John M. Pierce and James D. Bainbridge, and unknown others at PBBPH Law in the failed settlement negotiations.

356.   Chasan and BJC Law refrained from filing a tort action against John M. Pierce and PBBPH Law in reliance on the false statements of Pierce and Bainbridge and others at PBBPH Law, in the unfortunate and misled belief that the Defendants were attempting to negotiate a settlement in good faith.

357.   When Chasan and BJC served discovery and noticed Hamilton's deposition in No. 18-cv-5399, Pierce and Bainbridge and PBBPH Law knew or

should have known that Plaintiffs intended to obtain information from

Hamilton regarding his evidence and viewpoints on the proposed settlement

(assuming he even knew anything about it), *i.e.*, discovery that would, at a

minimum enable Chasan and BJC Law to support their Complaint, or

amended it if needed, and prove their entitlement to the settlement.

358.   The response of the PBBPH Law defendants opposing discovery,

and moving for a stay of all discovery on grounds including privilege, was

calculated on their part to prevent discovery of non-privileged facts that

would have uncovered their lies and helped Chasan and BJC prove their

claims, or otherwise amend their claims, and prevail.

WHEREFORE, Plaintiffs pray for a judgment granting equitable relief

opening and setting aside the judgment in *Law Offices of Bruce J. Chasan,*

*LLC, et al. v. Pierce Bainbridge Beck Price & Hecht, LLP, et al.*, No. 18-cv-

5399-AB, 2019 WL 1957950 (E.D. Pa. May 2, 2019), and such other

equitable relief as is appropriate, plus costs of suit.

**COUNT II – EQUITABLE ACTION TO VACATE THE JUDGMENT IN No. 20-cv-1338 DUE TO FRAUD -- WHICH PLAINTIFFS WERE UNABLE TO DISCOVER DESPITE REASONABLE DILIGENCE – AGAINST JOHN M. PIERCE, JAMES D. BAINBRIDGE, PBBPH LAW, BAINBRIDGE LAW APC, PIERCE BAINBRIDGE P.C., JOHN PIERCE LAW, P.C., JOHN DOE ATTORNEYS 1-10 (*i.e.,* ATTORNEYS AT PBBPH LAW INVOLVED IN SCUTTLING THE SETTLEMENT), AND JOHN DOE ENTITIES 1-10 (AS ADDITIONAL SUCCESSORS IN INTEREST OR ASSIGNEES OF PBBPH LAW).**

359.  All averments in the foregoing paragraphs are realleged and

incorporated herein by reference.

360.  When Chasan and BJC served discovery in No. 18-cv-5399 and No. 20-cv-1338, Pierce and Bainbridge and PBBPH Law knew or should have known that Plaintiffs intended to obtain information from and concerning Hamilton regarding his evidence and viewpoints on the proposed settlement (assuming he even knew anything about it), and also discovery concerning the role of Hamilton and Pierce (and any other PBBPH Law attorneys) in Hamilton's decision to terminate Chasan's representation of Hamilton on or about March 27, 2018, and *i.e.*, discovery that would, at a minimum enable Chasan and BJC Law to support their Complaint in No. 18-cv-5399, or amend it if needed, and prove their entitlement to the settlement, and proof of tortious interference with contractual relations, and also to amend their Complaint in No. 20-cv-1338.

361.  The response of the PBBPH Law defendants opposing discovery, and moving for a stay of all discovery on grounds including privilege, was calculated on their part to prevent discovery of non-privileged facts that would have uncovered their lies and helped Chasan and BJC prove their claims, or otherwise amend their claims, and prevail on claims for enforcement of the settlement and tortious interference with contractual relations.

WHEREFORE, Plaintiffs pray for a judgment granting equitable relief opening and setting aside the judgment in *Law Offices of Bruce J. Chasan, LLC, et al. v. Pierce Bainbridge Beck Price & Hecht, LLP, et al.*, No. 20-cv-

1338-AB, 2021 WL 148406 (E.D. Pa. January 15, 2021).

**COUNT III – ENFORCEMENT OF SETTLEMENT AGREEMENT – AGAINST JOHN M. PIERCE, JAMES D. BAINBRIDGE, PBBPH LAW, BAINBRIDGE LAW APC, PIERCE BAINBRIDGE P.C., JOHN PIERCE LAW, P.C., JOHN DOE ATTORNEYS 1-10 (*i.e.*, ATTORNEYS AT PBBPH LAW INVOLVED IN SCUTTLING THE SETTLEMENT), AND JOHN DOE ENTITIES 1-10 (AS ADDITIONAL SUCCESSORS IN INTEREST OR ASSIGNEES OF PBBPH LAW).**

362.  All averments in the foregoing paragraphs are realleged and incorporated herein by reference.

363.  A settlement agreement was reached by the exchange of emails between Pierce and Chasan on 9/10/2018 and 9/15/2018.  The term mentioned by Pierce for Hamilton's approval was immaterial because Pierce had fraudulently misrepresented that Hamilton had authorized a malpractice action against Chasan, and Pierce and PBBPH Law never discussed the settlement with Hamilton in any event.  Pierce and PBBPH Law did not inform Hamilton about the settlement negotiations, or the agreement, or the drafts of releases.  Hamilton, in fact, never expressed any disapproval of the settlement.

364.  As Pierce proposed, PBBPH Law would pay Chasan and BJC Law $160,000, regardless of the outcome of Hamilton's "right of publicity" lawsuit, and Chasan and BJC Law would not be entitled to any further recovery.  It was thus implicit that Chasan and BJC Law would provide a release of all further claims against Hamilton, Pierce, and PBBPH Law.

365.  Hamilton was a third-party beneficiary in that PBBPH Law would

pay a portion of Hamilton's incurred legal fees from BJC Law, and Hamilton would be relieved of all liability for the balance.

366.  The parties expressly contemplated mutual releases before 9/10/2018.  Pierce had threatened not only a legal malpractice case on behalf of Hamilton, but also retaliatory lawsuits against Chasan and BJC Law on behalf of PBBPH Law.  But Pierce and PBBPH Law were willing to forego those threats in the drafts of all the Settlement Agreements exchanged.

367.  Pierce and Bainbridge and PBBPH Law misrepresented to Chasan that Hamilton would not agree to the settlement.

368.  Pierce and PBBPH Law used Hamilton's alleged refusal to approve the settlement as a pretext for backing out of the settlement that Pierce had expressly proposed on 9/10/2018.

369.  The allegations of malpractice by Chasan that Pierce and Bainbridge manufactured were meritless.

370.  Pierce and PBBPH Law had remorse about the deal they proposed on 9/10/2018, in light of subsequent developments in the litigation of Hamilton's "right of publicity" case, and that remorse was their motivation for backing out of the deal they made.

WHEREFORE, Plaintiffs pray for judgment in their favor on this claim to enforce the settlement agreement, and damages of $160,000.00, plus pre-judgment interest, plus post-judgment interest and costs of suit.

**COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS - AGAINST JOHN M. PIERCE, JAMES D. BAINBRIDGE, PBBPH LAW, BAINBRIDGE LAW APC, PIERCE BAINBRIDGE P.C., JOHN PIERCE LAW, P.C., JOHN DOE ATTORNEYS 1-10 (*i.e.*, ATTORNEYS AT PBBPH LAW INVOLVED IN INDUCING HAMILTON TO FIRE CHASAN, AND IN SCUTTLING THE SETTLEMENT), AND JOHN DOE ENTITIES 1-10 (AS ADDITIONAL SUCCESSORS IN INTEREST OR ASSIGNEES OF PBBPH LAW).**

371.  All averments in the foregoing paragraphs are realleged and incorporated herein by reference.

372.  This Count is based on the Restatement (Second) of Torts, § 766, which was adopted by the Pennsylvania Supreme Court in *Adler, Barish, Daniels, Levin & Creskoff v. Epstein*, 393 A.2d 1175, 1181-82 (Pa. 1978), *cert. den.*, 442 U.S. 907 (1979).

373.  There is (or was) a contract between Plaintiff BJC Law and a third party, Lenwood Hamilton (**Exh. A**), as described above in ¶¶ 22-23.

374.  Defendants PBBPH Law, Pierce, Bainbridge, and others in PBBPH Law Beck, negligently and intentionally interfered with Hamilton's performance of the contract by inducing or otherwise causing Hamilton to terminate Plaintiffs' representation and make a new contract with PBBPH Law, as described in **Exh. B**, and above in ¶¶ 31, 174-175.

375.  Plaintiffs BJC Law and Chasan suffered damages as a result of Hamilton's termination of the representation in that BJC Law lost the value of Chasan's billable hours (up to $319,240.78) as of 3/31/2018.

376.  Defendants PBBPH Law, Pierce, Bainbridge and others in PBBPH

Law are liable to Plaintiffs for damages for their tortious interference with contract because their actions in causing or inducing Hamilton to terminate Chasan's representation were improper for numerous reasons, as described below, without limitation.   These actions by Defendants are not sanctioned by the "rules of the game" which society has adopted.

377.   Defendants' actions were improper because Chasan invited Pierce and his law firm to be co-counsel with BJC Law on the condition that BJC Law and Pierce's law firm would split the 40 percent contingency on a 20/20 basis, provided Pierce's law firm could bring financing and complete future litigation work on a roughly 50-50 basis going forward (where Hamilton had fully supported Chasan's search for a third-party funder). Instead, Pierce and his law firm persuaded Hamilton to discharge Chasan and BJC Law and go completely with PBBPH Law.  Had Chasan and BJC Law had a crystal ball and foreseen what Pierce and PBBPH Law would do, in derogation of the condition that was the basis for the invitation to Pierce, Chasan would never have introduced Pierce to Hamilton.

378.   Defendants' actions were improper because they induced Hamilton to discharge Chasan without any payment for Chasan's considerable legal work on behalf of Hamilton, as invoiced by BJC Law. Although a client has a right to discharge a lawyer at any time, that right is subject to liability for payment of the lawyer's services.  Defendants knew Hamilton lacked resources to compensate BJC Law and Chasan.  Defendants

nevertheless facilitated Hamilton's discharge of Chasan by hiring replacement attorneys from the Stradley Ronon law firm, at Defendants' own expense, to serve as local docket counsel for Hamilton, without making arrangements for any payment to BJC Law.

379.  Defendants' actions were improper because they made no arrangement for a division of any contingent fee with a quantum meruit portion, or any appropriate percentage, going to BJC Law and Chasan. Plaintiffs would certainly have been entitled to a portion, as Plaintiffs filed Hamilton's Complaint when no other law firm would do so and avoided a time bar as to certain tort claims; Plaintiffs also amended the Complaint twice and defeated the motion to dismiss the SAC filed by Epic Games, Microsoft and Speight; and Plaintiffs also initiated discovery on behalf of Hamilton and marshaled Hamilton's responses to the discovery served by Epic Games, Microsoft and Speight.  But for the efforts of BJC Law and Chasan, Hamilton would have had no case at all.  Notably, the Pravati - PBBPH Law Agreement provides that if PBBPH Law is substituted out of a contingent fee case, PBBPH Law is required to take commercially reasonable steps to secure its portion of any contingent fee earned by settlement or judgment.  *See ante*, ¶ 209.  But here, with the shoe on the other foot, PBBPH Law and its partners made no effort to allocate any portion of a potential recovery to BJC Law and Chasan, or to compensate BJC Law and Chasan for their considerable efforts of Hamilton's behalf.

380.  Defendants' actions were improper because Hamilton's upset at Chasan over their dispute regarding what settlement demand to convey to Microsoft does not provide cover to Defendants for simultaneously agreeing to represent Hamilton and pushing out Chasan and BJC Law.  There are disputes every day in the United States between plaintiffs with jackpot expectations and their contingent fee lawyers who take a more sober view of the evidence, the legal issues and the risks of litigation.   Instead of stroking Hamilton with money and benefits, the proper course for Defendants would have been to remind Hamilton of all that Chasan had accomplished for him, to remind him that Chasan had detailed knowledge of the case (as opposed to Defendants' then-superficial knowledge), and most importantly, that despite their disagreement as to how to posture a settlement negotiation, Chasan, in fact, had continued to work diligently to find a third-party funder for the case, and had succeeded!   Moreover, Chasan was agreeable in March 2018 to going forward with Pierce and PBBPH Law, as proposed, on the basis of a 20/20 split of the 40 percent contingency, with PBBPH Law arranging the financing of the litigation expenses.

381.  Pierce was motivated to take over the whole case because if PBBPH Law had a 20/20 split with BJC Law on the contingency, PBBPH Law would have to split its share with Pravati on a 50-50 basis, such that PBBPH Law would net only 10 percent of any settlement or judgment, net of expenses.

382.   Pierce was motivated to take over the whole case for his own marketing purposes, as he liked portraying himself as an aggressive trial counsel and "Goliath-slayer" of mammoth defendants such as Epic Games and (especially) Microsoft.

383.   Pierce was motivated to take over the whole case because he had law firm funding from Pravati, win or lose, and thus he was more prone to risk it all at trial than Chasan.  This is another reason he wanted to avoid disputes with Chasan over any settlement posture of the case.

384.   Pierce was motivated to take over the whole case because he wanted to use it as a marketing tool to attract litigation funding and new hires for PBBPH Law, and partners including but not limited to Bainbridge went along with this plan and participated in it and supported it.

385.   Pierce and PBBPH Law had no knowledge let alone investment in Hamilton's "right of publicity" case prior to 3/13/2018, when Eva Shang of Legalist, Inc. introduced Pierce and Chasan via an email sent to both.

386.   Pierce, being a stranger to Chasan, had little or no inhibition about offending Chasan by taking over Hamilton's case.  It is unlikely he would have done such a thing with another attorney he knew well for 10 or 15 years, or that he would have threatened a long-time attorney acquaintance with an eight-figure malpractice action.

387.   In connection with Hamilton's termination of Chasan and BJC Law on 3/27/2018, Bainbridge and other partners in PBBPH Law are equally

liable with Pierce regardless of their degree of involvement in the decision making, and regardless of the extent of their involvement in taking steps and measures to effectuate the termination of BJC Law and Chasan.  They all participated in the decision and conduct.  Defendants were all agents for one another, and they all ratified Chasan's termination.

388.  The conduct of Defendants was and is outrageous and subjects them to appropriate punitive damages.

WHEREFORE, on Count IV, Plaintiffs demand judgment in their favor and against Defendants PBBPH Law, Pierce, Bainbridge, Bainbridge Law APC, Pierce Bainbridge, P.C., John Pierce Law, P.C., John Doe Attorneys 1-10, and John Doe Entities 1-10, jointly and severally, or on any appropriate fair share basis, for a sum of at least $319,240.78, being the value of Plaintiffs' legal services on behalf of Hamilton, plus punitive damages to be assessed by a jury, plus costs and expenses and any other appropriate relief.

**COUNT V – FRAUDULENT EMAIL MESSAGE THAT HAMILTON AUTHORIZED A MALPRACTICE ACTION AGAINST CHASAN -- AGAINST JOHN M. PIERCE, PBBPH LAW, BAINBRIDGE LAW APC, PIERCE BAINBRIDGE P.C., JOHN PIERCE LAW, P.C., AND JOHN DOE ENTITIES 1-10 (AS ADDITIONAL SUCCESSORS IN INTEREST OR ASSIGNEES OF PBBPH LAW).**

389.  All averments in the foregoing paragraphs are realleged and incorporated herein by reference.

390.  Pierce's email to Chasan on 4/30/2018 falsely stating that Hamilton had authorized an 8-figure malpractice case against Chasan was intended to intimidate Chasan and BJC Law from pursuing a civil action to

recover attorney's fees for legal services on behalf of Hamilton.

391.   But Pierce also knew or should have known that a client's threat of a malpractice action against an attorney requires the attorney to report the claim to the attorney's errors and omissions carrier, lest the carrier later deny coverage because the claim may not have been reported during the period of policy coverage, or because a belated notification by the attorney might prejudice the carrier in the defense of the claim.

392.   Malpractice claims against attorneys are prejudicial to attorneys even if the claims are meritless because insurance underwriters can and do increase premiums for coverage at renewal time based on the numerosity of claims against the attorney, and the expenses for defense of the claims (even if the claims are meritless).  These expenses are included in "loss runs" which track an insurer's expenses for the defense of claims, and the payment of settlements and judgments.

393.  Chasan promptly reported to his insurance carrier on April 30, 2018 the threat Pierce made on behalf of Chasan's former client Hamilton.

394.  The threat was damaging to Chasan in that it was a factor in causing Chasan's carrier to increase the premium for coverage at the next policy renewal anniversaries.

395.  The threat was also damaging to Chasan in that it made it more difficult for Chasan's insurance broker to market Chasan for coverage by other insurance carriers, and some insurance carriers declined to provide

competitive quotes.  Thus, Chasan's marketability as an insurable attorney was caused to suffer as a direct result of the false threat made by Pierce.

396.  Claims history and threats of claims are considered by insurance underwriters for numerous years after the claims and threats are made. Thus, the false threat of the malpractice action on behalf of Hamilton had a multiyear impact on Chasan's insurability.

397.  The Pennsylvania Supreme Court requires licensed attorneys in the Commonwealth to carry malpractice insurance coverage or otherwise advise new clients that they do not carry professional liability insurance of at least $100,000.  Pa. R. P. C. 1.4(c).

398.  Pierce intended Chasan to rely on his false threat of Hamilton's authorization of an 8-figure malpractice action, and Chasan justifiably relied on it, and was damaged because of it.

399.  The conduct of Pierce and PBBPH Law in communicating the false threat on behalf of Hamilton was malicious and outrageous, and subjects Pierce and PBBPH Law subject to punitive damages.

WHEREFORE, Plaintiffs demand judgment against Pierce, PBPPH Law, Bainbridge Law APC, Pierce Bainbridge, P.C., John Pierce Law, P.C., and John Doe Entities 1-10 that are successors-in-interest to or assignees of PBBPH Law, in an amount to be proved, plus punitive damages, plus delay damages, pre-judgment interest, post-judgment interest, and costs.

**COUNT VI – FRAUDULENT REPRESENTATION THAT HAMILTON WOULD NOT APPROVE THE SETTLEMENT -- AGAINST JOHN M. PIERCE, JAMES D. BAINBRIDGE, PBBPH LAW, BAINBRIDGE LAW APC, PIERCE BAINBRIDGE P.C., JOHN PIERCE LAW, P.C., JOHN DOE ATTORNEYS 1-10, AND JOHN DOE ENTITIES 1-10 (AS ADDITIONAL SUCCESSORS IN INTEREST OR ASSIGNEES OF PBBPH LAW).**

400.  All averments in the foregoing paragraphs are realleged and incorporated herein by reference.

401.  As described *ante* at ¶ 270, on 11/15/2018, Pierce emailed to Chasan that the settlement discussions were at an end, and he smugly taunted Chasan, stating: "I do look forward to seeing you again in court if we end up in the unfortunate position of needing to sue you on behalf of Skip for your repeated breaches of fiduciary duty to him."   He added, "Jim [Bainbridge] will have more details."   Implicit in this email was a representation that Hamilton would not approve the settlement, and Pierce Bainbridge was enthused to take up Hamilton's claims against Chasan for the as yet unexplained breaches of fiduciary duty.

402.  Soon thereafter on 11/15/2018, as described *ante* at ¶ 271, Bainbridge followed with another email outlining the alleged breaches of fiduciary duty based on Chasan's 3/12/2018 letter to Hamilton (**Exh. E**).

403.  There was no reason not to proceed with the settlement made on 9/15/2018 in the Pierce-Chasan exchange of emails, but for the implied representation that Hamilton would not approve it.

404.  That Hamilton would not approve the settlement was false

because Pierce and PBBPH Law never presented it to him for approval.

405.  Hamilton subsequently stated in 2021 that he had no objections to Chasan getting paid.  *See ante*, ¶¶ 333, 336 (citing **Exh. T**).

406.  Pierce's and PBBPH Law's reasons for terminating the settlement were false and fraudulent.

407.  In retrospect, the condition that Pierce stated in his 9/15/2018 email that Hamilton had to approve the settlement was false.  It was nothing but a self-serving "Get Out Jail Free" card that Pierce held up his sleeve.  But at the time, on 9/15/2018, it was an outward expression that Chasan was entitled to rely upon at face value.

WHEREFORE, Plaintiffs demand judgment against Pierce, Bainbridge, PBPPH Law, Bainbridge Law APC, Pierce Bainbridge, P.C., John Pierce Law, P.C., John Doe Attorneys 1-10, and John Doe Entities 1-10 that are successors-in-interest to or assignees of PBBPH Law, in an amount not less than $160,000, plus punitive damages, plus delay damages, plus pre-judgment interest, plus post-judgment interest, and costs.

**COUNT VII – CIVIL CONSPIRACY - AGAINST JOHN M. PIERCE, JAMES D. BAINBRIDGE, PBBPH LAW, BAINBRIDGE LAW APC, PIERCE BAINBRIDGE P.C., JOHN PIERCE LAW, P.C., AND JOHN DOE ENTITIES 1-10 (AS ADDITIONAL SUCCESSORS IN INTEREST OR ASSIGNEES OF PBBPH LAW).**

408.  All averments in the foregoing paragraphs are realleged and incorporated herein by reference.

409.  The facts outlined above show that both Pierce and Bainbridge

negligently and/or willfully conspired to commit fraudulent acts as follows: (a) assert false representations that Hamilton authorized a malpractice action against Chasan, which damaged Chasan's insurability in the insurance market for errors and omissions coverage, and (b) assert false representations that Hamilton would not approve the settlement negotiated between Pierce and Chasan on 9/10/2018 and 9/15/2018, thereby scuttling the settlement.

410. Overt acts in furtherance of the conspiracy were committed on 11/15/2018 by both Pierce and Bainbridge in their emails sent to Chasan, which established that they had a common and agreed purpose of describing alleged breaches of fiduciary duty on the part of Chasan toward Hamilton.

WHEREFORE, Plaintiffs demand judgment against Pierce, Bainbridge, PBPPH Law, Bainbridge Law APC, Pierce Bainbridge, P.C., John Pierce Law, P.C., John Doe Attorneys 1-10, and John Doe Entities 1-10 that are successors-in-interest to or assignees of PBBPH Law, in an amount not less than $160,000, plus punitive damages, plus delay damages, plus pre-judgment interest, plus post-judgment interest, and costs.

**COUNT VIII – CONCERTED ACTION, AND AIDING AND ABETTING FRAUD - AGAINST JAMES D. BAINBRIDGE, PBBPH LAW, BAINBRIDGE LAW APC, PIERCE BAINBRIDGE P.C., JOHN PIERCE LAW, P.C., AND JOHN DOE ENTITIES 1-10 (AS ADDITIONAL SUCCESSORS IN INTEREST OR ASSIGNEES OF PBBPH LAW).**

411. All averments in the foregoing paragraphs are realleged and incorporated herein by reference.

412.  The conduct of James D. Bainbridge as described above is independently actionable under the Restatement (Second) of Torts, § 878, in that (a) it comprised tortious conduct in concert with Pierce, (b) it knowingly aided and abetted Pierce's frauds, thereby giving substantial assistance to Pierce's frauds against Chasan, and (c) it gave substantial assistance to Pierce in accomplishing Pierce's frauds, and separately inflicted frauds upon Chasan.

WHEREFORE, Plaintiffs demand judgment against Bainbridge, PBPPH Law, Bainbridge Law APC, Pierce Bainbridge, P.C., John Pierce Law, P.C., John Doe Attorneys 1-10, and John Doe Entities 1-10 that are successors-in-interest to or assignees of PBBPH Law, in an amount not less than $160,000, plus punitive damages, plus delay damages, plus pre-judgment interest, plus post-judgment interest, and costs.

[intentionally left blank – continued on next page]

**JURY DEMAND**

413.  Plaintiffs demand a trial by jury as to all issues triable to a jury.

Respectfully submitted,

/s/ Bruce J. Chasan

_____
Bruce J. Chasan, Esq. (Atty I.D. No. 29227)
1500 JFK Boulevard, Suite 910
Philadelphia, PA 19102
215-567-4400
bjchasan@brucechasanlaw.com

/s/ Clifford E. Haines

_____
Clifford E. Haines, Esq. (Atty. I.D. No. 9882)
Haines & Associates, P.C.
The Widener Building – 5th Floor
1339 Chestnut Street
Philadelphia, PA 19107-3520
215-246-2201
chaines@haines-law.com

*Attorneys for Plaintiffs*